# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE MINDBODY, INC., | ) | CONSOLIDATED |
| STOCKHOLDERS LITIGATION | ) | C.A. No. 2019-0442-KSJM |

## MEMORANDUM OPINION

Date Submitted: September 8, 2020
Date Decided: October 2, 2020

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, Christopher Quinn, FRIEDLANDER & GORRIS, P.A, Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen, Christopher J. Orrico, Andrew E. Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Co-Lead Counsel for Plaintiffs.*

Lisa A. Schmidt, Robert L. Burns, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Matthew Solum, Yosef J. Riemer, John Del Monaco, Ian C. Spain, KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants Richard L. Stollmeyer and Brett White.*

Ryan D. Stottmann, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Patrick Gibbs, COOLEY LLP, Palo Alto, California; Sarah Lightdale, COOLEY LLP, New York, New York; *Counsel for Defendant Eric Liaw*.

**McCORMICK, V.C.**

This court has warned that the paradigmatic claim under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[1] arises when "a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price."[2] According to the plaintiffs, this cautionary tale provided the template for the 2019 sale of MINDBODY, Inc. ("Mindbody" or the "Company") to Vista Equity Partners ("Vista") for $36.50 per share.

The plaintiffs allege that the three defendants tilted the sale process in Vista's favor due to the following conflicts of interest: Mindbody's CEO and Chairman, Richard Stollmeyer, was motivated by a need for liquidity and the prospect of future employment with Vista. Mindbody's CFO and COO, Brett T. White, was motivated by the prospect of future employment. And one of Mindbody's outside directors, Eric Liaw, who was nominated to the board by a venture capital stockholder, was motivated by the stockholder's desire to exit its Mindbody investment.

The defendants have moved to dismiss the plaintiffs' claims. They attack the plaintiffs' theory of conflict as to each fiduciary and describe the plaintiffs' allegations concerning efforts to tilt the process in Vista's favor as inadequate. They contend that the involvement of an informed and engaged board of directors defeats

---

[1] 506 A.2d 173 (Del. 1986).

[2] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005).

any claim for liability arising from the merger.  They further assert that the merger was ratified under *Corwin* by a fully-informed, uncoerced stockholder vote.  All of the defendants' arguments ignore the well-pleaded allegations supporting the plaintiffs' paradigmatic *Revlon* claim, and this decision largely denies the motion.

## I.    FACTUAL BACKGROUND

The facts are drawn from the First Amended Verified Consolidated Class Action Complaint (the "Amended Complaint")[3] and documents it incorporates by reference.

### A.    The Company

In 2001, Stollmeyer founded Mindbody, a Delaware corporation, to operate cloud-based business management and payments software for the wellness services industry.  In 2004, Stollmeyer became Chairman of the board of directors (the "Board") and CEO of the Company.  Before the merger, Stollmeyer held approximately 265,000 Class A shares, which carried one vote per share, and approximately 1.5 million Class B shares, which carried ten votes per share. Stollmeyer controlled 19.8% of the Company's voting power.

By 2012, Mindbody had received multiple rounds of venture capital funding, including from venture capital firm Institutional Venture Partners ("IVP").  Before

---

[3] C.A. No. 2019-0442-KSJM, Docket ("Dkt.") 146, First Am. Verified Consolidated Class Action Compl. ("Am. Compl.").

2

the Merger, IVP held approximately 1 million Class A shares and approximately 1.6 million Class B shares, giving IVP control over 24.6% of the Company's voting power. Liaw, IVP's general partner, was appointed to the Board in February 2014.

At all relevant times, the eight-person Board comprised Stollmeyer, Liaw, and non-parties Katherine Blair Christie, Court Cunningham, Gail Goodman, Cipora Herman, Adam Miller, and Graham Smith.

### B.    Mindbody's Pre-Merger Acquisitions

After going public in 2015, Mindbody made two strategic acquisitions. In February 2018, Mindbody acquired FitMetrix, Inc. ("FitMetrix"), a company that integrates fitness studio equipment and fitness wearables with performance tracking technology. In April 2018, Mindbody acquired Booker Software, Inc. ("Booker"), a company that offers cloud-based business management software for salons and spas. Mindbody's stock price closed at $37.50 per share after the Booker acquisition.

Throughout 2018, Stollmeyer and White[4] assured stockholders and analysts that the Company's post-acquisition integration efforts would yield significant growth in 2019. For example, on a May 8, 2018 earnings call, Stollmeyer explained that Mindbody was "significantly investing both in Booker and FitMetrix to set the

---

[4] White held approximately 139,000 Class A shares and approximately 166,000 Class B shares. He did not serve on the Board.

3

stage for a much greater growth to come."[5] He described Mindbody's goal of exiting 2018 "with a truly unified and aligned business, capable of returning to profitability and growing strongly for years to come."[6]

Similarly, during a July 31, 2018 earnings call, Stollmeyer reported "solid progress" on the Company's integration efforts and explained that the Booker and FitMetrix acquisitions would "fuel strong growth in the target market customer base in 2019."[7] He further emphasized: "There's no one in the world that has our go-to-market capabilities now in any of our target markets and nobody has the strength of our products . . . . [W]e're very excited about our long-term growth prospects."[8] White stated on that call: "We remain on target to return to non-GAAP profitability in 2019 . . . . [W]e've done a lot of heavy lifting on the integration."[9]

Throughout September 2018, Stollmeyer and White continued to tout the Company's acquisitions as likely to spur growth. In a September 9, 2018 email to Mindbody management, Stollmeyer endorsed an analyst report issued by Wells Fargo Securities, which provided a price target of $45 per share based on the Company's growth projections, which were based on management's guidance.

---

[5] Am. Compl. ¶ 34.

[6] *Id.*

[7] *Id.* ¶ 35.

[8] *Id.* ¶ 36 (alteration in original).

[9] *Id.* ¶ 37.

4

On September 18, 2018, the Company hosted an analyst day. There, Stollmeyer and White "highlighted the Company's market dominance[] and growth in various financial metrics."[10] Stollmeyer presented a slide deck that proclaimed "The Integration is Working" and set forth the Company's planned integration timeline.[11] After the conference, J.P. Morgan maintained an "Overweight" recommendation with price target of $48 per share, reporting that Mindbody had "a great competitive position and a long runway of companies to penetrate and grow as customers."[12] KeyBanc also maintained an "Overweight" recommendation with a price target of $47 per share, specifically citing a new payments platform called "Payment 2.0" that had been rolled out to Mindbody's salon and spa customers.[13]

Mindbody's stock price increased by almost 7% within a week of the analyst day. On September 25, 2018, its stock price closed at $43.85 per share.

## C. Incentives to Force a Sale of the Company

According to the Amended Complaint, Stollmeyer was motivated to force a sale of Mindbody despite the Company's anticipated growth following the FitMetrix and Booker acquisitions.

---

[10] *Id.* ¶ 52.

[11] *Id.*

[12] *Id.* ¶ 53.

[13] *Id.* ¶¶ 53–54.

5

Stollmeyer's personal wealth was concentrated in Mindbody stock. In his words, his wealth was "locked inside" Mindbody.[14] Stollmeyer was unable to liquidate his holdings on the market, except pursuant to a 10b5-1 plan, which he analogized to "sucking through a very small straw."[15] In a post-merger podcast interview, Stollmeyer put it this way:

> [F]or the entrepreneur or particularly for the CEO, [an IPO] is not a liquidity event. Your capital is locked inside the business, and you can sell tiny bits of it, called the 10b5-1 plan where you decide essentially a year in advance, a couple of quarters in advance, you come up with a plan that says sell off a little bit on these predefined dates. It doesn't matter if the stock got hammered, it doesn't matter if the stock's high. So, it's kind of like sucking through a very small straw. For me, I had been at it for a long time. . . . We were public in 2015, so I'd been at it for 15 years. We would have public investors. I would have them challenge me that I was selling my own stock, and he was like, "Don't you believe in your own company, Rick?" 98% of my net worth is in the stock of my company, which is extremely volatile. I'm in my 50s now, and I've got kids in college. What kind of question is that?[16]

---

[14] *Id.* ¶¶ 5, 40.

[15] *Id.*

[16] *Id.* ¶ 5 (quoting Alejandro Cremades, *Rick Stollmeyer On Selling For $1.9 Billion The Company That He Created Out Of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage/).

Stollmeyer's personal finances seemed stretched as of 2018.[17]  He had invested $1 million in his wife's wellness company and $300,000 into another family-affiliated venture.  He had pledged $3 million to a local college, of which $2.4 million was unpaid.  He had embarked on a home renovation project of over $1 million and held a sizeable mortgage.  He had made loans to his brothers and former business partner for their own real estate purchases.  Plus, he wanted to make a six-figure investment in his son's start-up company, a six-figure loan to a friend, and another six-figure investment in a new venture.

Stollmeyer had taken action to increase his liquidity in the first half of 2018.  He told his financial advisor that he would be "digging into his . . . [line of credit]" to fund various expenses.[18]  He also executed a new 10b5-1 plan in February 2018, pursuant to which he would sell 17,739 shares of Mindbody stock every month.  As Stollmeyer himself explained, these sales were "top of mind" for Stollmeyer due to his significant personal expenses.[19]

The Amended Complaint also alleges that IVP was motivated to force a sale of Mindbody, although the allegations as to IVP are less compelling than those against Stollmeyer.  IVP's Mindbody investment was held by a fixed-life investment

---

[17] *Id.* ¶ 42.

[18] *Id.* ¶ 41 (alteration in original).

[19] *Id.*

fund, which seeks to exit its investments between three to five years. According to internal documents, IVP sought to exit its Mindbody investment in 2018, and Liaw planned to step down from the Board in 2019. As of 2018, however, IVP had not yet had an exit opportunity. IVP could not easily sell its large block of Mindbody stock on the public markets without accepting a discount.[20]

### D. Stollmeyer Receives a Direct Expression of Interest from Vista and Instructs Senior Management Not to Discuss a Sale of the Company with the Board.

In the years preceding the Company's initial public offering in 2015, Stollmeyer had discussed a potential buyout with Vista, a private equity firm. Stollmeyer and Vista communicated again in 2017, but Vista chose not to engage in buyout talks at that time because Mindbody stock was trading "at an all-time high."[21]

Vista's attitude changed in late 2018. On August 7, 2018, Stollmeyer met with an investment banker from Qatalyst Partners ("Qatalyst") named Jeff Chang. According to the Amended Complaint, Stollmeyer "shared his frustrations with running a public company and his preference for selling Mindbody to a private

---

[20] The Amended Complaint also alleges that Stollmeyer and IVP were motivated to sell in 2019 because they faced a potential diminution of their voting power in 2021. Before the Merger, Stollmeyer and IVP collectively controlled approximately 44% of Mindbody's voting equity, mostly through their Class B shares. The Class B shares, however, were set to convert automatically to single-vote Class A shares sometime in 2021. The automatic conversion would have reduced Stollmeyer and IVP's collective voting power to 10%. This diminution of voting power would make it more difficult for Stollmeyer and IVP to force a sale of the Company.

[21] Am. Compl. ¶ 32.

equity fund that would agree to employ Stollmeyer and his management team in the post-merger entity."[22] Chang reconnected Stollmeyer with one of Vista's principals, Monti Saroya, and introduced Stollmeyer to contacts at two other private equity firms.

Stollmeyer did not meet with either of the two other firms until mid-October and early November, but he met with Vista right away. Vista had a history of retaining management in take-private transactions and offering them compensation packages with significant upside.[23] On August 23, 2018, Saroya and another Vista executive met with Stollmeyer to discuss Mindbody's business and Stollmeyer's goals. Vista invited Stollmeyer to attend a summit for Vista's portfolio company founder-CEOs, whom Vista refers to as "CXOs" (the "CXO Summit").[24]

The CXO Summit took place on October 8 and 9, 2018. There, Vista hyped its "history of generating enormous wealth" for its CXOs and presented a slide that read: "The Math: What's in It for Me? CXO: $1.1 [Billion] Net Realized Wealth to Date & $5.3 [Billion] in Potential Wealth Creation."[25] That slide included a bar

---

[22] *Id.* ¶ 45.

[23] The Amended Complaint alleges that Vista retained senior management at seventeen of the twenty companies it acquired in 2017 and 2018. It also alleges that, in connection with one of its buyouts, Vista provided buy-side equity that positioned the target entity's CEO to receive almost $1 billion over a seven-year period if Vista achieved a substantial return on its investment.

[24] Am. Compl. ¶ 49.

[25] *Id.* ¶ 57.

graph that bore entries such as "Net Realized Wealth," "Current Unrealized Wealth Creation," and "Wealth Potential."[26]  Another slide explained: "$488.6 [Million] Earned by Executives Since 2017 CXO."[27]  Vista boasted that its funds' total net internal rate of return of 23.5% was five times larger than that of the S&P 500, six times larger than the Russell 3000, and seven times larger than the NASDAQ 100.

After the CXO Summit, Stollmeyer sent a text to Saroya expressing that the "[p]resentations [were] very impressive."[28]  He also texted Mindbody President Mike Mansbach that the presentations were "mind blowing" and "inspiring."[29]  He stated:  "I actually like them. . . . You would too."[30]  In October 2018, after the CXO Summit, Vista and Qatalyst facilitated calls between Stollmeyer and at least two Vista CXOs who had been retained by Vista post-acquisition.

Not long after that, on October 16, 2018, Saroya provided Stollmeyer with "a direct expression of interest" to acquire Mindbody at "a substantial premium to [its] recent trading range."[31]  At the time, Mindbody's thirty-day volume weighted

---

[26] *Id.*

[27] *Id.*

[28] *Id.* ¶ 59.

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 65 (emphasis removed).

average price was $38.46, and Mindbody stock traded as high as $41.25 per share in October.

Stollmeyer informed members of management—White, Mansbach, and Mindbody general counsel Kimberly Lytikainen—of Vista's expression of interest. He said that Chang and Qatalyst "would be our best choice to advise as we explore the possibility of taking [Mindbody] private in 2019."[32]

Stollmeyer did not immediately disclose Vista's expression of interest to the Board,[33] and he instructed White, Mansbach, and Lytikainen not to discuss a sale of the Company with Board members: "I plan to socialize this possibility to the Board Directors [sic] individually over the next week. Please do not hint or otherwise discuss with them or anyone else until I have a chance to do so and give you the green light."[34] After receiving Vista's expression of interest, Stollmeyer advised senior management that Mindbody "would lean into an acquirer who sees our current

---

[32] *Id.* ¶ 68.

[33] The Amended Complaint alleges that the disclosures concerning Vista's expression of interest are inconsistent with contemporaneous documents. For example, the Definitive Proxy (defined below) states that on October 26, 2018, in response to an inquiry from Vista, the Board discussed hiring a financial advisor and forming a Strategic Committee. But the minutes of the Board meeting held on that date do not mention Vista's expression of interest, any potential sale process, the hiring of a financial advisor, or the formation of a committee.

[34] Am. Compl. ¶ 69 (emphasis removed).

11

capabilities" and that he "would not support the sale of [Mindbody] at this time in any other circumstance."[35]

On October 28, 2018, Stollmeyer sent Liaw and Goodman certain talking points in which he expressed his view that Mindbody's total addressable market was "enormous and . . . ripe for the taking" and that Mindbody "would like to be able to move more quickly out of the public eye and have a partner to work with that shares the vision."[36]  These talking points did not mention Vista's expression of interest.

### E. Management Lowers Guidance During the November 2018 Earnings Call.

On November 6, 2018, Stollmeyer and White led an earnings call during which they lowered the Company's guidance.  Mindbody had planned to hold the earnings call in October, but management made the decision on October 9, 2018, to push the earnings call back to November.

With that extra time, Mindbody management looked for ways to issue lowered guidance.  In an October 17, 2018 email to Nicole Gunderson, Mindbody's senior director of investor relations, White asked if there was "a creative way to guide 2019" on the upcoming earnings call.[37]  In her response, Gunderson explained that "even though the Company would realize the monetization of . . . Payments

---

[35] *Id.* ¶ 68.

[36] *Id.* ¶ 72.

[37] *Id.* ¶ 79.

2.0 . . . , Stollmeyer wanted to guide below Wall Street expectations by 'throwing Booker under the bus.'"[38]

Other contemporaneous communications identified in the Amended Complaint suggest that Stollmeyer's desire to lower guidance was inconsistent with management's actual expectations.

On October 19, 2018, Mindbody's Chief Strategy Officer, Josh McCarter, observed that management's draft presentation for an upcoming Board meeting concerning the Company's three-year plan was "shortchanging . . . payments and related financial services."[39]  He emphasized that the payments segment comprised "almost 40% of [Mindbody's] revenue" and had "a huge story to it" that Mindbody could sell to its "team and investors."[40]  He made a similar remark on October 25, 2018, when he again viewed a draft Board presentation and expressed: "I still feel we're missing detail on Payments."[41]

---

[38] *Id.*  Payments 2.0 was a newly implemented payment platform that simplified the on-boarding process for new customers.  It allowed for instant customer approval and for Mindbody's salon and spa customers to begin accepting and receiving payments in as little as two days, whereas the pre-existing on-boarding process for new customers "could take several days and 13 different steps to set up."  *Id.* ¶ 54.  Payments 2.0 "incentivized customers to take advantage of Mindbody's payment processing services, increasing the Company's revenues and profits."  *Id.*

[39] *Id.* ¶ 80.

[40] *Id.*

[41] *Id.* ¶ 81.

13

On November 3, 2018, one of Mindbody's managers in financial planning and analysis texted Mindbody's senior finance manager: "We minimally beat in October – that tells me we are on track to hit our forecast . . . . The question is – did the assumptions we saw in month 1 cause us to think our assumptions for month 2 and 3 need to be revised – I do not know of anything . . . that would materially change our assumptions for the preceding months."[42]

Still, as he prepared for the earnings call, Stollmeyer told White and Mansbach that "a few hundred thousand of Q4 revenue" would make a "huge difference" come November 6, 2018.[43] One reasonable reading of this email is that Stollmeyer was looking for a way to negatively affect Mindbody's stock price.

On the day before the earnings call, November 5, 2018, Stollmeyer convened the Audit Committee[44] to review the Q4 forecast and "align[] around a substantial guide down for the quarter."[45] Stollmeyer edited the Company's press release for the upcoming earnings call to read: "While we remain excited about our long term growth opportunities, we encountered greater operating challenges than expected in

---

[42] *Id.* ¶ 84 (emphasis removed).

[43] *Id.* ¶ 83.

[44] With the exception of Liaw and Stollmeyer, the Amended Complaint does not identify which Board members served on the Audit Committee.

[45] *Id.* ¶ 86 (alteration in original).

Q3, and this caused our results to come in below expectations."[46]  Stollmeyer revised

his script for the earnings call to note "execution challenges":

> We also experienced notable execution challenges in
> Q3 . . . .   These short term issues reflect in less than
> anticipated Q3 revenues, and a significant reset to our Q4
> growth expectations.  In my view these challenges stem
> from growing pains as our people, processes and systems
> adjust to the increased complexity of our business post-
> acquisitions.[47]

Stollmeyer and White then led the earnings call on November 6, 2018.

Mindbody's Form 8-K dated November 6, 2018 projected revenues of $65 to $67

million, reflecting a $1 to $3 million reduction from the projected $68 million

Mindbody had disclosed in August of that year.  After White provided this lowered

guidance on the earnings call, Stollmeyer explained:

> The combined effects of our recent acquisitions, go-to
> market reorganization and expanding consumer and
> partner initiatives have made [Mindbody] a considerably
> more complex business to operate than it was just 6
> months ago, and we did not meet our growth expectations
> in the second and third quarters.  We expect this to
> continue lagging a bit in Q4 as we communicated in our
> last call -- or continue to lag the expectations we
> communicated in our last call.[48]

---

[46] *Id.* ¶ 87.

[47] *Id.*

[48] *Id.* ¶ 89.

In response to questions from analysts, Stollmeyer noted: "[W]e've been humbled by the last couple of quarters in dealing with the magnitude of integrating these businesses and ramping up growth at the same time."[49]

After the earnings call, every analyst but one downgraded or reduced their price targets for the Company. One senior Mindbody executive confirmed that analysts were concerned with management's inconsistent messaging between the "bullish tone at [Mindbody's] recent analyst day" and the Company's new narrative that there would be "longer than expected integration and growth acceleration of Booker."[50] Mindbody stock closed at $32.63 the day of the earnings call, and it opened at $25.00 the next day.

The after-market reaction to the earnings call did not surprise Stollmeyer. On November 6, 2018 Stollmeyer texted Chang, saying: "We're not surprised by the after-market reaction. I'm fine."[51] In an email dated November 7, 2018, Stollmeyer explained: "We are resetting street expectations to position ourselves up for future beat and raises. We have a strong year of growth planned in 2019."[52]

In a November 13, 2018 interview with an analyst, White repeated Stollmeyer's narrative that the guide down was due to integration problems with

---

[49] *Id.* ¶ 90.

[50] *Id.* ¶ 94.

[51] *Id.* ¶ 96 (emphasis removed).

[52] *Id.* ¶ 97 (emphasis removed).

Booker. And Liaw privately explained to his partners at IVP that "the company will be in the penalty box through Q4 for sure with lots of questions in investors' minds until (i) 2019 guidance is provided on the Q4 call and (ii) progress is made against those goals."[53]

### F. The Sale Process

At some point after Vista's expression of interest, the Mindbody Board formed a committee that eventually became known the "Transaction Committee." The Definitive Proxy (defined below) states that the committee was formed on October 26, but the source of that date is unclear, as the minutes of the October 26, 2018 Board meeting do not mention the formation of a committee, Vista's expression of interest, any potential sale process, or the hiring of a financial advisors. The committee was chaired by Liaw and additionally comprised Stollmeyer, Cunningham, and Goodman.[54]

The Transaction Committee was initially formed "for the limited purpose of reviewing the potential engagement of a financial advisor to assist Mindbody with

---

[53] *Id.* ¶ 99.

[54] Liaw played some role in forming the committee. Around October 30, 2018, Liaw sent Lytikainen an email with the subject line "Ad hoc committee." *Id.* ¶ 74. Liaw copied Stollmeyer, Goodman, and Cunningham on the email. The email explained: "The directors on this email have agreed to form an ad hoc strategy committee for the company." *Id.*

evaluating potential strategic alternatives and evaluating candidates for this role, including Qatalyst."[55]

Qatalyst and one other potential advisor presented to the committee on November 14, 2018. Stollmeyer had already met with Qatalyst before the meeting and had received text messages containing deal advice from Qatalyst the morning of the meeting. During the meeting, Stollmeyer pushed to retain Qatalyst in part because Qatalyst had "proven results with [Mindbody's] most likely suitors."[56] Qatalyst presented a process timeline that contemplated four to five weeks for the submission of indications of interest, another four weeks to submit a final bid, and a tentative deal announcement date of February 18, 2019. The Transaction Committee took Stollmeyer's direction and authorized the retention of Qatalyst.

Stollmeyer and Qatalyst then selected potential bidders for Qatalyst to contact. The Amended Complaint alleges that the list of potential bidders did not include "logical" financial or strategic buyers, including those that "may not have needed Stollmeyer and his management team to build Mindbody into a great company."[57] During the selection process, McCarter recommended that Mindbody reach out to Global Payments Inc. because "[t]hey are making a push into [certain software] so

---

[55] *Id.* ¶ 102 (emphasis removed).

[56] *Id.*

[57] *Id.* ¶ 105.

18

they would possible [sic] be a good one if we're trying to push valuation up."[58]

Stollmeyer rejected this recommendation for personal reasons, explaining to McCarter that he "didn't want to work for a Payments company." [59]

The Board expanded the Transaction Committee's mandate on November 26, 2018. As expanded, the Transaction Committee's mandate was:

> [T]o advise, direct and oversee management of [Mindbody] in the review and negotiation of strategic alternatives, to evaluate indications of interest related thereto, to initiate solicitations of indications of interest, to meet on a regular basis with the management of [Mindbody] concerning such activities, and to make recommendations to the Board of Directors with respect to the foregoing . . . .[60]

Stollmeyer had been in touch with Vista throughout this time. He had texted Saroya a few days after the earnings call and met Saroya at Vista's San Francisco offices thereafter. Vista sent diligence requests in late November 2018 to Stollmeyer, White, and Liaw. Stollmeyer and White used that list to populate a data room for Vista. Vista and entities providing financing to Vista received access to over 1,000 documents. Stollmeyer and Saroya repeatedly communicated concerning Vista's review of the data room. Stollmeyer provided Saroya with real-time input on Vista's valuation model.

---

[58] *Id.* (emphasis removed).

[59] *Id.* (emphasis removed).

[60] *Id.* ¶ 108.

Other potential acquirers received less information and in a less timely fashion. Four private equity firms received access to a data room containing only thirty-five documents between December 15 and December 19, 2018. Another private equity firm was not granted access to the data room at all. One interested technology company received access to just 36 documents between December 17 and 20, 2018. And when it asked for certain information, Stollmeyer refused to provide it, taking the position that "we'd like to hold off on sharing our marketplace analysis on this until we have price [sic] on the table."[61] Stollmeyer later admitted that he did not want to work for that technology company.[62]

Vista submitted an offer to buy Mindbody at $35 per share on December 18, 2018.[63] The offer letter stated that Vista was "thoroughly impressed with Mindbody's executive management team" and "look[ed] forward to forming a successful and productive partnership with them going forward."[64] It further stated that Vista "seeks to invest in and partner with superior management teams" and that, "[t]hrough equity participation programs and incentive structures, Vista seeks to align management's incentives with its own in any potential transaction."[65] Qatalyst

---

[61] *Id.* ¶ 119.

[62] *Id.* ¶ 112.

[63] *Id.* ¶ 116.

[64] *Id.* ¶ 118 (alteration in original).

[65] *Id.* (alteration in original) (emphasis removed).

informed Stollmeyer and White that management could expect to receive a 10% equity stake in the post-merger entity, doubling management's pre-deal stake in the Company.[66]

At the time Vista submitted its offer, other potential acquirers were still early or mid-way through the diligence process. As Qatalyst informed the Transaction Committee on December 19, 2018, two firms were still engaged in due diligence at that time, and a third was early in its due diligence process. The Transaction Committee directed Qatalyst to communicate to all potential bidders "the competitive nature of the process, accelerated timeline, and the need for prompt indications of interest."[67] Qatalyst instructed two of the firms to provide an indication of interest within the next 24 to 48 hours.

In response to the Transaction Committee's acceleration of the process, all other potential bidders withdrew. They indicated that could not produce bids on "a timeline that would be competitive with Vista."[68]

## G.  The Board Approves a Sale to Vista.

On December 20, 2018, the Board met with Qatalyst and senior management to discuss Vista's bid. The Board instructed Qatalyst to seek a $40 per share price

---

[66] *Id.* ¶¶ 62, 124.

[67] *Id.* ¶ 121.

[68] *Id.* ¶ 122.

from Vista. Qatalyst relayed the message. Vista then made a "best and final" offer of $36.50 per share on December 21, 2018.[69] Liaw emailed his IVP colleagues stating that he thought Vista would "come up to $38" but that the market was depressed and "the rest of the possible field is far behind."[70]

The Board held a meeting to discuss the counteroffer on December 23, 2018. Qatalyst advised that other potential bidders needed time to complete due diligence before they could submit bids. Qatalyst then delivered a fairness opinion. The Board unanimously approved a sale of Mindbody to Vista at a price of $36.50 per share (the "Merger") and entered into a merger agreement dated December 23, 2018 (the "Merger Agreement").

Mindbody and Vista announced the Merger on December 24, 2018. The Amended Complaint alleges that the Company "tout[ed] that the Merger provided a 68% premium to Mindbody's per share closing price of $21.72 on December 21."[71] But the deal price of $36.50 was also an 18.2% discount to Mindbody's 52-week high of $44.60 per share, a 16.8% discount to Mindbody's stock price in late September of $43.85 per share, and a 5.1% discount to Mindbody's 30-day volume weighted average price before Vista's initial expression of interest.

---

[69] *Id.* ¶ 124.

[70] *Id.* (emphasis removed).

[71] *Id.* ¶ 127.

The day the deal was announced, an investor asked Stollmeyer whether he was "going to retire . . . [o]r keep running it."[72] Stollmeyer responded: "Vista loves me and wants us to step on the gas. No retirement in my headlights!"[73] Stollmeyer expressed similar sentiments to two of his financial advisors in a text message: "Vista's in love with me (and me with them). No retirement in my headlights. However, I will likely sell most or all of my stock. It will be incumbent upon them to provide compelling incentives."[74]

## H. The Go-Shop

The Merger Agreement provided a thirty-day go-shop period during which Mindbody could solicit and negotiate alternative acquisition proposals. The go-shop started on December 24, 2018—Christmas Eve—and ended on January 22, 2019. The go-shop provision required that a competing bidder make a contractually defined "Superior Proposal" that had to be accepted within the go-shop period to reduce the termination fee. Mindbody populated the go-shop data room with diligence Vista had received before making its initial bid of $35 per share, but "with some subtractions."[75] The go-shop data room did not include additional diligence Vista received before making its final bid of $36.50 per share. Two prospective

---

[72] *Id.* ¶ 155.

[73] *Id.* ¶¶ 10, 155 (emphasis removed).

[74] *Id.* ¶ 155 (emphasis removed).

[75] *Id.* ¶ 137.

acquirers communicated that they could not compete for Mindbody because of the go-shop's highly compressed timeline. And Mindbody delayed its negotiations with a potential strategic buyer concerning a non-disclosure agreement until only one week was left in the go-shop period. White then delayed approving the potential strategic buyer's diligence requests.

Stollmeyer and White were on vacation during the go-shop period. Stollmeyer went on vacation after the holidays and traveled to a remote location where "cell service was spotty."[76] White was on vacation until January 4, 2019. On January 6, 2019, White texted Stollmeyer: "I assume that we will be declining any go shop management discussion until you return, correct?"[77] Stollmeyer did not return from his vacation until January 14, 2019, with only eight days remaining in the go-shop period.

On January 11, 2019, while still on vacation, Stollmeyer accepted Vista's invitation to its February 2, 2019 CXO summit in Atlanta. Stollmeyer canceled his travel plans for that week so he could attend the CXO summit and attend the Super Bowl in Vista's suite. The Amended Complaint contains a photograph depicting Stollmeyer at the Super Bowl on February 3, 2019, with Saroya and a Vista CXO.[78]

---

[76] *Id.* ¶ 135.

[77] *Id.*

[78] *Id.* ¶ 9.

24

## I. Mindbody Fails to Disclose Its Q4 Results.

Meanwhile, Mindbody received its Q4 results in early January, reflecting estimated revenues of $68.3 million. Recall that Stollmeyer and White had lowered guidance from $68 million to $65 to $67 million on the November 6, 2018 earnings call. As Stollmeyer commented in a January 5, 2019 email to senior management: "Our estimated revenue of $68.3M reflects +37% growth [year-over-year] and a *massive beat* against the Street's consensus midpoint of $66M."[79] Mindbody's Q4 revenues also exceeded the Company's Q4 guidance before the guide down on November 6, 2018.

Vista assumed that Mindbody would not provide it with the Q4 results because Mindbody would then be required to provide other potential bidders with the Q4 results during the go-shop period. Vista employees commented in internal emails that "anything [Mindbody] share[s] with us will need to go to other buyers[,] so they may not share all the detail until after the go-shop."[80]

White provided the Q4 results to Vista on January 8, 2020—before the go-shop ended—but neither White nor Stollmeyer provided the Q4 results to other potential bidders before the go-shop period expired.

---

[79] *Id.* ¶ 139.

[80] *Id.* ¶ 141 (first and second alterations in original).

25

After the go-shop, Mindbody internally discussed disclosing the Q4 results to stockholders. On January 24, 2019, White emailed the Audit Committee stating that "[s]ince [Mindbody's] Q4 '18 revenue exceeded consensus pretty meaningfully ($68.3m actual vs $66m consensus) we think the right thin[g] to do is to publicly release this information via 8-K no later than Feb. 7 so the shareholders have the information before they vote."[81] Liaw responded that he "agree[d] with this approach."[82] Another Board member, Smith, responded that he wanted to know what would happen "if the vote fails on Feb. 14" before weighing in on whether the Q4 results should be publicly disclosed.[83]

Mindbody's outside counsel, Cooley LLP ("Cooley"), even drafted a press release concerning the Q4 results. On January 31, 2019, Cooley sent the pre-announcement release to Vista and asked if "Vista ha[d] a different view on this approach."[84] Counsel followed up the next day, asking: "[A]ny thoughts on the pre-announcement? We are happy to discuss if Vista had different views on this approach."[85] Mindbody did not disclose the Q4 results to stockholders before the stockholder vote on the Merger.

---

[81] *Id.* ¶ 142.

[82] *Id.*

[83] *Id.*

[84] *Id.* ¶ 143.

[85] *Id.*

## J.    The Merger Proxy and the Stockholder Vote

Mindbody filed its definitive proxy statement on January 23, 2019 (the "Definitive Proxy")[86] and a supplemental proxy statement on February 7, 2019 (the "Supplemental Proxy" and with the Definitive Proxy, the "Proxy").[87] The Amended Complaint alleges that the Definitive Proxy omitted two categories of material information.

The first category concerns Stollmeyer's alleged conflicts and dealings with Vista. The Definitive Proxy stated that "Vista and [Mindbody] had not engaged in any employment or retention-related discussions with regard to [Mindbody] management,"[88] but the Supplemental Proxy stated more carefully that "Vista and [Mindbody] had not discussed the terms of post-closing employment or equity participation for [Mindbody] management."[89] Neither the Definitive Proxy nor the Supplemental Proxy revealed the CXO Summit or the extent of Stollmeyer's interactions with Vista. The Proxy did not disclose that Vista expressed an interest in acquiring Mindbody at "a substantial premium to recent trading range" on

---

[86] Dkt. 169, Aff. of Matthew D. Perri, Esq. in Supp. of Defs.' Combined Opening Br. in Supp. of Their Mot. to Dismiss ("Perri Aff.") Ex. 2.

[87] Perri Aff. Ex. 11.

[88] Definitive Proxy at 32.

[89] Supplemental Proxy at 5.

27

October 16, 2018.[90] The Proxy also did not disclose that Stollmeyer and White gave Vista more information and input more timely than they gave other bidders.

The second category concerns the Q4 guidance and Q4 actuals. The Proxy did not disclose Mindbody's actual Q4 results, thereby leaving stockholders under the impression that the Merger price offered a substantial premium when it is reasonably conceivable that the premium resulted from the Q4 "guide down" on November 6, 2018 that depressed the Company's stock price.

On February 14, 2019, the holders of a majority of Mindbody's voting power voted to approve the Merger. As a condition to Vista's execution of the Merger Agreement, Stollmeyer and IVP executed irrevocable proxies directing the holder to vote all Mindbody shares they beneficially owned in favor of the Merger. Collectively, these irrevocable proxies represented approximately 32.1% of Mindbody's outstanding voting power (and approximately 46.2% of the vote when taking into account Mindbody options and RSUs). The Merger closed the next day.

### K. This Litigation

On January 29, 2019, after the Merger was announced and the Definitive Proxy issued, a Mindbody stockholder named Philip Ryan, Jr. filed a class action lawsuit in this court (the "Ryan Action") challenging the validity of the

---

[90] Am. Compl. ¶ 65 (emphasis removed).

February 14, 2019 stockholder vote.[91] Ryan also alleged that the members of the Board breached their fiduciary duties, including by failing to make proper disclosures in the Definitive Proxy. After the Supplemental Proxy issued, Ryan amended his complaint on February 13, 2019, largely maintaining his original claims and additionally alleging that the Supplemental Proxy was deficient.[92]

On January 30, 2019, another Mindbody stockholder, Luxor Capital Partners, LP, and its affiliates (collectively, the "Luxor Entities" or "Plaintiffs") filed a Section 220 action in this court (the "Section 220 Action").[93] With documents obtained through the Section 220 Action, on June 12, 2019, the Luxor Entities filed a class action lawsuit in this court for breach of fiduciary duty against Stollmeyer, White, and Liaw (the "Luxor Action").[94] On October 1, 2019, the court issued an Order consolidating the Ryan Action and the Luxor Action, severing Ryan's claims challenging the technical validity of the stockholder vote, and appointing the Luxor

---

[91] *Ryan v. Mindbody, Inc.*, C.A. No. 2019-0061-KSJM, Dkt. 1, Verified Class Action Compl.

[92] Dkt. 6, Am. Verified Class Action Compl.

[93] *Luxor Cap. P'rs, LP v. Mindbody, Inc.*, C.A. No. 2019-0070-JTL, Dkt. 1, Verified Compl. for Inspection of Books and Records. The affiliates comprise Luxor Capital Partners Offshore Master Fund, LP, Luxor Wavefront, LP, and Lugard Road Capital Master Fund, LP. At the time of the sale to Vista, the Luxor Entities beneficially owned approximately 9 million Class A shares of Mindbody stock, representing approximately 18.9% of Mindbody's outstanding common stock.

[94] *Luxor Cap. P'rs LP v. Stollmeyer*, C.A. No. 2019-0442-KSJM, Dkt. 1, Verified Class Action Compl.

Entities as lead plaintiffs to pursue the remaining claims.[95]

The Luxor Entities filed their Verified Consolidated Class Action Complaint on October 17, 2019,[96] and then filed the Amended Complaint on February 20, 2020. The Amended Complaint asserts two Counts. In Count I, Plaintiffs claim that Stollmeyer and White breached their fiduciary duties in their capacities as officers by initiating, timing, and tilting the sale process in favor of Vista in their own self-interest. In Count II, Plaintiffs claim that Stollmeyer and Liaw breached their fiduciary duties in their capacities as directors by failing "to disclose all material information to Mindbody stockholders" in advance of the stockholder vote on the Merger.[97]

Stollmeyer, White, and Liaw (collectively "Defendants") moved to dismiss the Amended Complaint on March 12, 2020.[98] The parties completed briefing by May 19, 2020,[99] and the court held oral argument on May 27, 2020.[100] After

---

[95] Dkt. 36, Order Consolidating Related Actions, Severing Claim, and Establishing a Leadership Structure.

[96] Dkt. 45, Verified Consolidated Class Action Compl.

[97] Am. Compl. ¶ 185.

[98] Dkt. 167, Defs.' Mot. to Dismiss First Am. Verified Consolidated Class Action Compl.

[99] Dkt. 168, Defs.' Combined Opening Br. in Supp. of Their Mots. to Dismiss ("Defs.' Opening Br."); Dkt. 174, Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("Pls.' Answering Br."); Dkt. 180, Defs.' Combined Reply Br. in Supp. of their Mots. to Dismiss ("Defs.' Reply Br.").

[100] Dkt. 198, Oral Arg. on Defs.' Mots. to Dismiss Held via Zoom.

argument, the Delaware Supreme Court published *City of Fort Myers General Employees' Pension Fund v. Haley*, addressing issues relevant to Defendants' motion to dismiss.[101] The court requested supplemental briefing on questions arising from *Haley*,[102] which the parties completed on September 8, 2020.[103]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss both Counts of the Amended Complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[104] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[105] The court, however, need not "accept

---

[101] -- A.3d --, 2020 WL 3529586 (Del. June 30, 2020).

[102] Dkt. 201, Letter from the Hon. Kathaleen St. J. McCormick to Counsel Requesting Suppl. Briefing.

[103] Dkt. 203, Pls.' Suppl. Br.; Dk. 204, Defs.' Suppl. Br. in Supp. of Dismissal of the Verified Consolidated Class Action Compl. ("Defs.' Suppl. Br.").

[104] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[105] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

31

conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[106]

Plaintiffs' theory of the case focuses on Stollmeyer, and this analysis follows suit. The analysis begins by applying the Rule 12(b)(6) standard to Plaintiffs' claims against Stollmeyer, which are subject to enhanced scrutiny under *Revlon* unless Defendants can demonstrate that *Corwin* cleansing applies. The analysis then addresses Plaintiffs' response to *Corwin*, which argues that the stockholder vote was not fully informed. The analysis last addresses the claims against White and Liaw.

## A. Plaintiffs Have Pleaded a Claim for Breach of Fiduciary Duty Against Stollmeyer.

The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*.[107] The court must therefore examine whether the fiduciaries of the corporation have performed their fiduciary duties "in the service of a specific objective: maximizing the sale price of the enterprise."[108]

---

[106] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[107] 506 A.2d 173 at 183.

[108] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (citing *Revlon*, 506 A.2d at 183); *see also Revlon*, 506 A.2d at 182–83 (explaining that, in the change-of-control context, the duty of loyalty requires "the maximization of the company's value at a sale for the stockholders' benefit"); *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 44 (Del. 1994) ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.").

Under *Revlon*, "directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[109]

In *Toys "R" Us*, this court observed that "the paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price."[110] Put slightly differently, the paradigmatic *Revlon* claim involves a conflicted fiduciary who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value.

Even when *Revlon* applies, a plaintiff must still plead facts sufficient to state a non-exculpated claim against directors protected by an exculpatory charter provision. This is because "*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally

---

[109] *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011).

[110] 877 A.2d 975, 1002 (Del. Ch. 2005) (quoted favorably in *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 n.4 (Del. 2018) (ORDER)); *see also* Leo E. Strine, *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 Bus. Law. 679, 683 (2015) (noting that non-management directors rely principally upon management for advice, that a problem can arise in that regard where management is conflicted, and that such a situation arises, for example, "if a CEO has corralled his top four managers, gone off without board authorization, baked up a proposal with his favorite private equity shop, and caused his managers and himself to make contractual commitments to vote for the private equity proposal and not to work for anyone else").

apply"[111]—it is just "a context-specific articulation of the directors' duties."[112] Well pleaded facts that track the paradigmatic *Revlon* theory will typically support a non-exculpated claim as to the conflicted fiduciary.[113]

A plaintiff need not plead a claim as to every board member or as to a majority of the board to state a claim for liability under *Revlon*.[114] The sins of just one fiduciary can support a viable *Revlon* claim. A plaintiff can state a *Revlon* claim by pleading that one conflicted fiduciary failed to provide material information to the board or that the board failed to sufficiently oversee the conflicted fiduciary.[115]

In this case, the Amended Complaint tracks the paradigmatic *Revlon* plotline. Plaintiffs allege that Stollmeyer was conflicted because he had an interest in near-term liquidity and an expectation that he would receive post-Merger employment

---

[111] *Malpiede*, 780 A.2d at 1083.

[112] *Kahn*, 2018 WL 1341719, at *1 n.3; *see Malpiede*, 780 A.2d at 1083–84 ("Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale.").

[113] *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015) (observing that one way for a plaintiff to state a non-exculpated claim is to allege "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests" and that the director acted to furtherance of that interest).

[114] *Kahn*, 2018 WL 1341719, at *1.

[115] *Id.* at *1 n.4; *Mills Acq. Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018); *Toys "R" Us*, 877 A.2d at 1002–03. *See generally* Joel Edan Friedlander, *Confronting the Problem of Fraud on the Board*, 75 Bus. Law. 1441 (2019) (collecting cases involving fraud-on-the-board theories).

accompanied by significant equity-based incentives as a Vista CXO. Plaintiffs also allege that Stollmeyer tilted the sale process by strategically driving down Mindbody's stock price and providing Vista with informational and timing advantages during the due-diligence and go-shop periods. Plaintiffs further allege that Stollmeyer withheld material information from the Board and that the Board failed to adequately oversee Stollmeyer.

This section first addresses the allegations concerning Stollmeyer's conflicts. It then turns to the allegations concerning Stollmeyer's efforts to tilt the sale process in favor of Vista. It last evaluates the Board's role in the process.

### 1. It is Reasonably Conceivable that Stollmeyer was Conflicted.

It is a guiding principle of Delaware law that material amounts of stock ownership can serve to align the interests of fiduciaries with the interests of other stockholders.[116] Defendants invoke this principle to argue that Stollmeyer's interests

---

[116] *Chen v. Howard-Anderson*, 87 A.3d 648, 670–71 (Del. Ch. 2014) (observing that owning material amounts of stock "aligns [fiduciaries'] interests with other stockholders by giving them a 'motivation to seek the highest price' and the 'personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so'" (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del. Ch. 2010))); *see also Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002) ("A director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."); *In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991) (observing that directors' equity ownership created "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992).

aligned and did not conflict with the Mindbody stockholders' interests in obtaining the highest possible price. Stollmeyer owned significant amounts of Mindbody stock, the value of his stock was directly tied to the Merger price, and he received the same Merger consideration as every other stockholder. To Defendants, these facts standing alone defeat any allegations that Stollmeyer's interests conflicted with those of the Mindbody stockholders.

Plaintiffs respond that, despite his significant stockholdings, it is reasonably conceivable that Stollmeyer's subjective desire for near-term liquidity and the opportunity to continue as CEO of the post-Merger entity placed his interests in conflict with the interests of the Mindbody stockholders.

Delaware law recognizes that "liquidity is one 'benefit that may lead directors to breach their fiduciary duties'" if a "'desire to gain liquidity . . . caused them to manipulate the sales process' and subordinate the best interests of the corporation and the stockholders as a whole."[117]

---

[117] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *41 (Del. Ch. Oct. 16, 2018) (quoting *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012)); *see also McMullin v. Beran*, 765 A.2d 910, 922, 926 (Del. 2000) (reversing the Court of Chancery's grant of a motion to dismiss where it was alleged that the company's controller and its board designees "sacrifice[ed] some of the value of [the target]" to accommodate the controller's "immediate need for cash"); *PLX*, 2018 WL 5018535, at *42 (finding post-trial that two negotiators "had a divergent interest in achieving quick profits by orchestrating a near-term sale at PLX"); *Answers*, 2012 WL 1253072, at *7, *9 (denying a motion to dismiss, observing that "[l]iquidity has been recognized as a benefit that may lead directors to breach their fiduciary duties," and concluding that the complaint adequately alleged that a large stockholder's liquidity needs were a source of conflict for the stockholder's two board appointees); *N.J. Carpenters*

Delaware law also recognizes that management's prospect of future employment can give rise to a disabling conflict in the sale context.[118] This theory is particularly viable where the future employment offers a marked increase in compensation from the status quo.[119]

Regardless of the underlying theory, the key in evaluating whether financial interests gave rise to a disabling conflict is to look to the subjective intent of the

*Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *9–10 (Del. Ch. Oct. 6, 2011) (denying a motion to dismiss, observing that "[l]iquidity has been recognized as a benefit that may lead directors to breach their fiduciary duties," and finding that allegations of a CEO's "desperate[]" need for liquidity was a source of conflict for the CEO); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 113 (Del. Ch. 2007) (granting a motion for a preliminary injunction where the record supported a finding that the CEO, who was nearing retirement, harbored liquidity driven conflicts that caused him to accept the suboptimal merger price rather than hold out for a value maximizing transaction); *In re Telecorp PCS, Inc. S'holder Litig.*, C.A. No. 19260-VCS (Del. Ch. June 17, 2002) (TRANSCRIPT) (denying a motion to dismiss and recognizing a large stockholder's "desire[] to liquidate its . . . holdings to meet increasingly pressing cash needs" as a source of conflict).

[118] *See, e.g.*, *Xura*, 2018 WL 6498677, at *13 (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977–78 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004), which held in the demand futility context that the president, chief operating officer, and director of the company "ha[d] a material interest in her own continued employment"); *Answers*, 2012 WL 1253072, at *7 (denying a motion to dismiss where the complaint alleged that the CEO's desire to "keep his job [was] what caused him to seek a sale").

[119] *See, e.g.*, *Haley*, 2020 WL 3529586, at *12, *17 (reversing trial court's decision to grant a motion to dismiss where the plaintiffs had sufficiently alleged that the CEO's interest "in a compensation proposal having a potential upside of nearly five times his compensation at [the target]" rendered him "materially interested in the transaction"); *Xura*, 2018 WL 6498677, at *13 (denying a motion to dismiss where the plaintiff alleged that the CEO's interests, which included "a $25 million payout and continued employment post-closing in the face of his looming termination," caused him to push for a near-term sale of the company with little regard to value maximization).

fiduciary.[120]   At the pleading stage, the question is whether it is reasonably conceivable that the fiduciary was subjectively affected by the conflict at issue.

In this case, Plaintiffs' liquidity-driven and prospective-employment theories of conflicts work in combination to land a powerful one-two punch on Stollmeyer, rendering it reasonably conceivable that Stollmeyer subjectively harbored interests in conflict with those of the Mindbody stockholders.

The court need not infer that Stollmeyer subjectively desired near-term liquidity—he said as much himself.   Almost all of Stollmeyer's net worth pre-Merger was, in his words, "locked inside" Mindbody stock, which he described as "extremely volatile."[121]  Because Mindbody was publicly traded, Stollmeyer could only "sell tiny bits" of his Mindbody stock pursuant to a 10b5-1 plan—a process he described as "kind of like sucking through a very small straw."[122]  And Stollmeyer's personal financial situation was such that it required cash flow.  After executing a new 10b5-1 plan in February 2018, he explained to his financial advisor that the sale of his Mindbody stock pursuant to that plan was "top of mind" for him because of

---

[120] *See Haley*, 2020 WL 3529586, at *15 (observing, in analyzing whether an alleged conflict was material, that the test is subjective and "*not* how or whether a reasonable person in the same or similar circumstances would be affected by a financial interest of the same sort as present in the case, but whether *this* director in fact was or would likely be affected" (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995))).

[121] Am. Compl. ¶¶ 5, 40.

[122] *Id.*

"greater than expected H1 cash outlays."[123]   These cash outlays, the Amended Complaint alleges, included a variety of significant personal expenses totaling somewhere in the multi-millions.[124]   Indeed, Stollmeyer himself explained to his financial advisors on the day the Merger was announced that he was "likely [to] sell most or all of [his] stock."[125]

Similarly, the court need not infer that Stollmeyer subjectively desired future employment with and compensation from Vista—he said as much himself.  The Amended Complaint alleges that after Stollmeyer told Chang that he was motivated to sell to a buyer who would retain his management team,[126] Chang connected Stollmeyer to Vista.  Stollmeyer met with Vista to discuss his own "goals"[127] and then attended the CXO Summit, which he described as "mind-blowing" and "inspiring."[128]   There, Vista boasted that it had been able to generate $1.1 billion in net realized wealth for its CXOs, that there still remained $5.3 billion in "potential wealth creation,"[129] and that Vista CXOs had earned $488.6 million in the past year

---

[123] *Id.* ¶ 41.

[124] *Id.* ¶ 42.

[125] *Id.* ¶ 155.

[126] *Id.* ¶ 45.

[127] *Id.* ¶ 49.

[128] *Id.* ¶¶ 9, 59.

[129] *Id.* ¶ 57.

alone.[130] Stollmeyer told Vista that the presentations were "very impressive."[131] He told management: "I actually like them. . . . You would too."[132] Stollmeyer communicated with Vista and Vista CXOs privately on numerous occasions before and during the sale process.[133] Moreover, Stollmeyer came to learn that management would receive new options for 10% of the post-closing company, *doubling* management's pre-Merger equity stake in Mindbody.[134] This was the cherry on top for Stollmeyer, who on the day the Merger was announced stated to his financial advisors in a text message: "Vista's in love with me (*and me with them*). No

---

[130] *Id.*

[131] *Id.* ¶ 59.

[132] *Id.*

[133] *See, e.g.*, *id.* ¶ 49 ("On August 23, 2018, Saroya and Vista Vice President, Nicholas Stahl, met with Stollmeyer onsite at Mindbody to discuss Mindbody's business and 'Rick's goals.'"); *id.* ¶ 56 ("At the . . . CXO Summit, Stollmeyer continued his discussions with Saroya and Vista co-founders Robert Smith and Brian Sheth."); *id.* ¶ 59 (alleging that Stollmeyer texted Saroya after attending the CXO Summit); *id.* ¶ 64 ("On October 11, 2018, Chang asked Stollmeyer for more information . . . . Three days later, Stollmeyer continued the discussion about a potential transaction with Saroya."); *id.* ¶ 65 (explaining that Saroya provided Stollmeyer with a "direct expression of interest" to acquire Mindbody at "a substantial premium to recent trading range" on October 16, 2018); *id.* ¶ 101 ("On November 10, Stollmeyer texted Saroya, and asked to speak by phone. Shortly thereafter, Stollmeyer and Saroya agreed to meet at Vista's San Francisco offices."); *id.* ¶ 107 ("Stollmeyer continued his private conversations with Vista, including on November 21, 2018."); *id.* ¶ 113 ("Stollmeyer and Saroya continued text messaging and speaking by phone throughout November and mid-December concerning Vista's review of the 1,000 documents in the data room to which Vista received access."); *id.* ¶ 114 ("Saroya and Stollmeyer spoke on the evening of December 17 to talk 'about go to market and some of [Vista's] findings' and they spoke again on December 18 . . . .").

[134] *Id.* ¶¶ 12, 62.

40

retirement in my headlights."[135]

In briefing, Defendants ask the court to draw inferences directly contrary to Stollmeyer's own statements. They attack Plaintiffs' combined theory in parts, addressing the liquidity-driven and prospective-employment conflicts separately. This approach not only fails to acknowledge the force of the combined argument, but it also underestimates each theory in its own right.

As to the liquidity-driven theory, Defendants rely primarily on language from *In re Synthes, Inc. Shareholder Litigation*[136] for the proposition that liquidity needs can give rise to a conflict only where there is a "crisis," "fire sale," or "exigent need" for "immediate cash."[137] The court's hyperbolic language in *Synthes* is best read in the context in which it was issued, where then-Chancellor Strine was reacting to a particularly poorly drafted complaint "strikingly devoid of pled facts to support" the alleged liquidity-driven conflict.[138]

In *Synthes*, the plaintiffs alleged that a controlling stockholder breached his fiduciary duties by refusing to consider an acquisition that would have cashed out the minority stockholders but required the controller to remain as an investor.[139]

---

[135] *Id.* ¶ 155 (emphasis added).

[136] 50 A.3d 1022 (Del. Ch. 2012).

[137] Defs.' Opening Br. at 30, 38–41, 56–60; Defs.' Reply Br. at 13–16.

[138] *Synthes*, 50 A.3d at 1037.

[139] *Id.* at 1024.

Instead, the controller and the board negotiated an all-cash merger with a consortium of private entities, where the controller and the minority stockholders received the same consideration.[140]

In an effort to invoke the entire fairness standard, the plaintiffs alleged that the controller had unique liquidity needs that infected the sale price.[141] The controller had retired from his management positions and stayed on as board Chairman.[142] He was 76 years old and was alleged to have a need to liquidate his holdings to effectuate estate planning and tax goals.[143] He directly owned around 38% and controlled 52% of the voting stock, and thus could not liquidate his stake on the market without affecting the share price.[144] The plaintiffs argued that, to achieve his liquidity goals, the controller needed to sell to a single buyer promptly.[145] The court summarized the plaintiffs' theory as follows: "[The controller] was an impatient capitalist looking to sell out fast and thus willing to take a less than fair market value for [the company], if that got in the way of a hasty exit."[146]

The court rejected the plaintiffs' conflict theory at the pleading stage on the

---

[140] *Id.*

[141] *Id.* a 1025–26.

[142] *Id.* at 1025.

[143] *Id.*

[144] *Id.*

[145] *Id.* at 1025–36.

[146] *Id.* at 1035.

ground that it was not reasonably conceivable. While recognizing that "[t]he world is diverse enough" to make reasonably conceivable "narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment," the court further held that this is an "uncommon scenario" that "ha[d] no application" in the case before it.[147] The court observed that the plaintiffs' theory ran contrary to well-pleaded facts. The plaintiffs admitted that the controller was a "loaded"[148] "billionaire,"[149] and pleaded that the sale process was "a patient process reasonably calculated to generate the highest value the market would pay for [the company]."[150] Also, the plaintiffs pled "no facts suggesting that [the controller] faced a solvency issue[] or even the need to buy something other than a Ferrari or Lamborghini when he purchased his next vehicle," and made no allegations suggesting that the controller "was in any particular rush to sell his . . . shares."[151] Indeed, by oral argument, the plaintiffs had "retreated" from and "conceded that they did not plead facts supporting" aspects of their liquidity-driven theory of conflict.[152]

---

[147] *Id.* at 1036.

[148] *Id.* at 1034.

[149] *Id.* at 1025.

[150] *Id.* at 1037.

[151] *Id.* at 1036.

[152] *Id.* at 1037.

The facts of *Synthes* stand in stark contrast to the facts of this case. The Amended Complaint portrays Stollmeyer not as the "loaded" billionaire but, rather, as an impatient capitalist sick of "sucking through a very small straw."[153] The Amended Complaint adequately alleges that Stollmeyer was unable to access his own wealth, was strapped for cash in light of significant personal expenses, and made sure his financial advisors knew that the sales of what little he *could* sell were "top of mind."[154] The allegations concerning Stollmeyer's liquidity needs, particularly when coupled with the allegations supporting Plaintiffs' prospective-employment theory, suffice to make it reasonably conceivable that Stollmeyer was conflicted.[155]

---

[153] Am. Compl. ¶¶ 5, 40.

[154] *Id.* ¶ 41.

[155] Policy considerations regarding controlling stockholders' incentives also played a factor in the court's reticence to lend credence to the liquidity-driven conflict theory at issue in *Synthes*. As the court observed, there are good policy reasons for incentivizing a controller to agree to a transaction that treats all stockholders equally. "If one wishes to protect minority stockholders, there is a good deal of utility to making sure that when controlling stockholders afford the minority pro rata treatment, they know that they have docked within the safe harbor created by the business judgment rule." *Synthes*, 50 A.3d at 1035–36. By contrast, if an inference that the controller desired liquidity—a desirable and frequent byproduct of M&A transactions—standing alone could trigger the entire fairness standard "even when [controlling stockholders] share the premium ratably with everyone else, they might as well seek to obtain a differential premium for themselves or just sell their control bloc, and leave the minority stuck." *Id.* at 1035–36; *see also Larkin v. Shah*, 2016 WL 4485447, at *16 n.96 (Del. Ch. Aug. 25, 2016) (observing that the court in *Synthes* recognized the "perverse incentives" for controlling stockholders that would result from a contrary rule). These concerns are arguably less significant outside of the controlling stockholder context, where the stockholder has less coercive leverage and no potential sale of control threatens to leave minority stockholders "stuck."

Of course, liquidity-driven theories of conflicts can be difficult to plead.[156]

This is because Delaware law presumes that investors are rational economic

---

[156] *Compare supra* note 117 (collecting cases in which courts recognized liquidity-driven theories of conflict), *with In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at \*10 (Del. Ch. May 11, 2017) (recognizing liquidity as a potential source of conflict but granting a motion to dismiss where the "bare allegation[s]" in the complaint were insufficient to support the plaintiffs' liquidity theory), *In re Merge Healthcare Inc.*, 2017 WL 395981, at \*8 (Del. Ch. Jan. 30, 2017) (recognizing that circumstances in which an investor is required "to dump stock, for liquidity purposes, at less than full value, create divergent interests" but granting a motion to dismiss where the allegations were insufficient to support the plaintiff's liquidity theory), *Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2016 WL 6892802, at \*16–17 (Del. Ch. Nov. 23, 2016) (recognizing that "a quick infusion of cash . . . require[d] to satisfy [a] need for liquidity" is a "unique benefit" that can give rise to a conflict, but granting a motion to dismiss where the allegations were insufficient to support plaintiff's liquidity theory), *aff'd*, 172 A.3d 884 (Del. 2017) (TABLE), *Larkin*, 2016 WL 4485447, at \*16–17 (recognizing that liquidity-based conflict can exist in some circumstances but granting a motion to dismiss where the complaint was "devoid of non-conclusory allegations that would support a reasonable inference that the [relevant actors] faced a unique liquidity need"), *In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at \*9 (Del. Ch. Oct. 1, 2015) (recognizing "cases in which a plaintiff's allegations of a large stockholder's need for liquidity have been sufficient to defeat a motion to dismiss" but granting a motion to dismiss the plaintiffs' liquidity theory at the pleading stage because they failed to allege more than "a simple desire to 'sell quickly'"), *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at \*14–15 (Del. Ch. Oct. 24, 2014) (recognizing liquidity at the pleading stage as a "unique benefit" giving rise to conflict but granting a motion to dismiss where the allegations were insufficient to support the plaintiff's liquidity theory), *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 661 (Del. Ch. 2013) (recognizing liquidity as a potential source of conflict but granting a motion to dismiss where the plaintiffs "ple[d] no facts supporting a rational inference" that such conflict existed), *Synthes*, 50 A.3d at 1033–35 (recognizing at the pleading stage that an "immediate need for liquidity could constitute a disabling conflict of interest" but granting a motion to dismiss where the complaint was "strikingly devoid of pled facts" to support the plaintiffs' liquidity theory), *and Chen*, 87 A.3d at 672 (recognizing that "liquidity is one benefit that may lead directors to breach their fiduciary duties" but denying a motion for preliminary injunction where the evidence did not support a liquidity-driven conflict).

actors,[157] and it is often unreasonable to conclude that "rational economic actors have chosen to short-change themselves" in favor of liquidity.[158]  Although it is a rare set of facts that will support a liquidity-driven conflict theory, the reality is that rational economic actors sometimes do place greater value on being able to access their wealth than on accumulating their wealth, as this court has recognized.[159] Stollmeyer's self-professed fatigue of "sucking through a very small straw"[160] makes it reasonably conceivable that this case fits the rare fact pattern.

As to the prospective-employment theory, Defendants rely primarily on *English v. Narang*[161] and *Toys "R" Us*[162] to argue that Plaintiffs' allegations concerning the interactions between Stollmeyer and Vista do not support an inference that the prospect of future employment gave rise to a disabling conflict.[163]

In *English*, the plaintiffs argued in the context of a *Corwin* motion to dismiss that the company's disclosures omitted material information concerning discussions

---

[157] *Chen*, 87 A.3d at 670 ("Delaware law presumes that investors act to maximize the value of their own investments." (quoting *Katell v. Morgan Stanley Gp., Inc.*, 1995 WL 376952, at *12 (Del. Ch. June 15, 1995)).

[158] *Larkin*, 2016 WL 4485447, at *16 (recognizing that "[t]his court has, in the past, evaluated liquidity theories . . . with marked skepticism, characterizing them as 'unusual,' 'counterintuitive,' and 'aggressive'" (quoting *Synthes*, 50 A.3d at 1034–35)).

[159] *See supra* note 117.

[160] Am. Compl. ¶¶ 5, 40.

[161] 2019 WL 1300855 (Del. Ch. Mar. 20, 2019).

[162] 877 A.2d 975 (Del. Ch. 2005).

[163] Defs.' Opening Br. at 33–38.

about post-closing employment opportunities for management.[164] The plaintiffs based their argument on the generic proposition that the private equity buyer routinely retained existing management teams and the fact that employment agreements were disclosed on the date of the closing.[165] In rejecting this argument, Chancellor Bouchard found that allegations concerning the private equity buyer's "reputation for retaining management" and the timing of the announcement regarding the employment agreements, standing alone, were insufficient to give rise to the inference that discussions about post-closing employment occurred.[166]

In this case, unlike in *English*, Plaintiffs do not rely solely on Vista's reputation for retaining management or the timing of any post-closing employment agreements. As discussed above, Plaintiffs rely on a plethora of facts, including Stollmeyer's own words, Stollmeyer's numerous interactions with Vista, and Vista's direct representations to Stollmeyer and management. These circumstances collectively make it reasonable to infer that post-closing employment and compensation was a motivating factor for Stollmeyer.

In *Toys "R" Us*, then-Vice Chancellor Strine found that an acquirer's direct message that its bid was conditioned on the "retention of key (but unspecified)

---

[164] 2019 WL 1300855, at *1.

[165] *Id.* at *12.

[166] *Id.* at *13.

members of management" did not give rise to a disabling conflict.[167] The court made this finding when denying a motion for a preliminary injunction. The evidentiary record reflected that the CEO "negotiated for the removal of provisions for the retention of . . . management upon which [the acquirer] conditioned its bid," supported the "pursuit of strategic alternatives that put his job at risk," and "adamantly refused to create an appearance problem by talking with bidders about his future."[168] The court refused to "infer that [the CEO's] judgment was tainted by a personal desire to advantage himself at the expense of the Company's public stockholders."[169] In light of the CEO's commendable conduct, the court found that the CEO took "value-maximizing steps without regard for his future employment."[170]

This case, unlike *Toys "R" Us*, is at the pleading stage, and the court does not have an evidentiary record of dispositive facts revealing the CEO's earnest efforts to maximize stockholder value without regard for his future employment. Rather, this decision is issued on a motion to dismiss where the court must accept as true all facts set forth in the Amended Complaint and draw all reasonable inferences therefrom.

---

[167] 877 A.2d at 1003; *id.* at 1003–06.

[168] *Id.* at 1003–04.

[169] *Id.* at 1005.

[170] *Id.*

In sum, none of the cases on which Defendants rely undercut Plaintiffs' liquidity-driven or prospective-employment theories of conflict. It is reasonably conceivable that, in light of his self-professed desire for near-term liquidity and for future employment with Vista, Stollmeyer harbored interests that conflicted with those of the Mindbody stockholders.

### 2. It Is Reasonably Conceivable that Stollmeyer Tilted the Sale Process in Vista's Favor.

Plaintiffs assert that Stollmeyer tilted the sale process in Vista's favor by: (a) lowering guidance to depress Mindbody's stock and make it a more attractive target at the time Vista was looking to acquire Mindbody and (b) providing Vista with timing and informational advantages over other bidders.

### a. Lowered Guidance

As of September 2018, public statements and internal chatter presented a rosy picture of Mindbody's integration efforts. Stollmeyer assured stockholders and management that the Company's integration efforts would yield significant growth

in 2019.[171] He provided the same assurance to his management team.[172] At the Company's analyst day on September 18, 2018, Stollmeyer presented a slide deck that bore the words "The Integration is Working" and set forth the Company's planned integration timeline.[173] Mindbody stock closed at $43.85 per share one week later—up nearly 7% from the previous week.

By October 2018, Mindbody's management seemed to do an about-face. On October 9, 2018, management decided to delay the upcoming Q3 earnings call from October to November. In mid-October, management searched for a "creative way to guide 2019."[174] In late October, Stollmeyer expressed that "a few hundred thousand of Q4 revenue" would make a "huge difference" in the market.[175] He then lowered guidance by approximately $1 to $3 million, from the projected $68 million

---

[171] *See* Am. Compl. ¶ 34 (alleging that, on a May 8, 2018 earnings call, Stollmeyer explained that Mindbody was "significantly investing both in Booker and FitMetrix to set the stage for a much greater growth to come"); *id.* ¶ 35–36 (alleging that, on a July 31, 2018 earnings call, Stollmeyer reported "solid progress" on the Company's integration efforts, explained that the Booker and FitMetrix acquisitions would "fuel strong growth in the target market customer base in 2019," and stated: "There's no one in the world that has our go-to-market capabilities now in any of our target markets and nobody has the strength of our products . . . . [W]e're very excited about our long-term growth prospects.").

[172] *See id.* ¶ 51 (alleging that on September 9, 2018, Stollmeyer expressed to management that the Booker and FitMetrix acquisitions "improve[d] [Mindbody's] market position further"); *id.* (alleging that, in an email to "MB Leaders," Stollmeyer "endorsed" an analyst report that predicted significant annual revenue growth for Mindbody and laid out the Company's historical revenue increases).

[173] *Id.* ¶ 52.

[174] *Id.* ¶ 79.

[175] *Id.* ¶ 83.

50

Mindbody disclosed in August 2018 to the projected $65 to $67 million he and White disclosed on the Q3 earnings call. This was despite internal sentiment that Mindbody was "on track to hit [its] forecast."[176] Later, Mindbody's Q4 actuals—$68.3 million—reflected both several hundred thousand dollars more than Mindbody's $68 million projection in August 2018 and, in Stollmeyer's words, a "*massive beat* against the Street's consensus midpoint" of $66 million.[177] These facts make it reasonably conceivable that Stollmeyer provided lower guidance for reasons unrelated to business expectations.

At least two of the pivotal moments in this narrative—the decision to delay the Q3 earnings call and the decision to lower guidance—tie temporally to Stollmeyer's interactions with Vista. It was on day two of the "mind-blowing" and "inspiring" CXO Summit[178] that Mindbody decided to postpone its Q3 earnings call from its regularly scheduled date in October to November.[179] And it was on the day after Vista provided Stollmeyer with a direct expression of interest that management exchanged emails in search of a creative way to lower guidance on the Q3 earnings call.[180] This timing might prove to be coincidental. At this stage, Plaintiffs are

---

[176] *Id.* ¶ 84 (emphasis removed).

[177] *Id.* ¶ 139.

[178] *Id.* ¶ 59.

[179] *Id.* ¶ 63.

[180] *Id.* ¶ 79.

entitled to the inference that the timing was no coincidence.

All told, the well-pleaded allegations concerning Stollmeyer's personal interests, the temporal connections between Stollmeyer's interactions with Vista and the decisions to delay the earnings call and deliver lowered guidance, and the Company's actual Q4 performance make it reasonably conceivable that Stollmeyer strategically tanked Mindbody's stock price so that Vista could, as Plaintiffs put it, "buy the Company on the cheap."[181]  This conduct is, of course, inconsistent with value maximization.

Defendants raise factual points in response to Plaintiffs' arguments. Defendants rely on several internal emails and assert that the Audit Committee, not Stollmeyer, oversaw the Company's forward-looking guidance and made the call to lower the Q4 guidance.[182]  Defendants further assert that the Q4 guidance "was based on legitimate factors, not a nefarious plot to drive down the Company's stock price to somehow accommodate Vista's bid."[183]  They also argue that "[i]t is accepted, and expected, practice for publicly traded companies to guide below actual

---

[181] Pls.' Answering Br. at 40.

[182] Defs.' Opening Br. at 3, 43–45; Defs.' Reply Br. at 18–19.  Even setting aside the factual nature of this argument, Stollmeyer served on the Audit Committee, and the emails to which Defendants point were authored by Stollmeyer himself, undercutting Defendants' argument that the Audit Committee neutralized Stollmeyer's influence or conflicts.  *See* Perri Aff. Exs. 6, 7.

[183] Defs.' Opening Br. at 43–44.

performance so that they can beat 'the Street' expectations given the market's proclivity to punish companies for near misses of prior guidance."[184] These fact-based arguments run contrary to the plaintiff-friendly inferences required under Rule 12(b)(6) and fail for that reason.

### b. Timing and Informational Advantages

Plaintiffs allege that Stollmeyer gave Vista informational and strategic advantages over other potential bidders throughout the due diligence and go-shop periods.[185]

Throughout due diligence, Stollmeyer eliminated one potential bidder from the list and declined to share diligence with another after Vista made its initial bid for $35 per share, admitting in both instances that he did not want to work for those potential acquirers.[186] Stollmeyer provided Saroya with real-time input on Vista's valuation model, but he did not provide the same input to other potential bidders. Vista received access to more than a thousand documents in the data room throughout the diligence phase; other potential bidders received temporarily limited access to as few as thirty-five documents.

---

[184] *Id.* at 44.

[185] Pls.' Answering Br. at 50.

[186] Am. Compl. ¶ 105 (alleging that Stollmeyer removed Global Payments from outreach because he "[didn't] want to work for a Payments company" (alteration in original) (emphasis removed)); *id.* ¶¶ 112, 119 (alleging that Stollmeyer refused to share requested diligence with a Japanese company and that Stollmeyer later admitted that he "did not want to work for a Japanese company").

Throughout the go-shop, Mindbody provided less diligence to go-shop participants than it had to Vista *before* Vista made its bid for $35 per share.[187] The go-shop data room did not include the additional diligence Vista received before making its final bid of $36.50.[188] And when the Company received its Q4 results, they were provided in some form to Vista but not to any other potential bidder.[189] In light of these allegations, it is reasonably conceivable that Vista was given timing and informational advantages that uniquely positioned it for success.[190] It is also reasonable to attribute responsibility for these decisions to Stollmeyer in view of the facts alleged.[191]

Side-stepping the well-pleaded allegations concerning the sale process, Defendants come to the defense of the go-shop. Defendants argue that the Company had no obligation to offer a go-shop "'in the first instance,' much less to conduct one

---

[187] *Id.* ¶ 137.

[188] *Id.*

[189] *Id.* ¶ 141.

[190] *See RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 854 (Del. 2015) (holding that the solicitation process was structured and timed in a manner that "impeded interested bidders from presenting potentially higher value alternatives").

[191] Am. Compl. ¶ 22 ("Stollmeyer kept Mindbody's Q4 results from potential bidders, except for Vista."); *id.* ¶ 110 (alleging that Chang provided Stollmeyer with a list of Vista diligence requests and that Stollmeyer, with White, "immediately used that list to populate a dataroom for Vista"); *id.* ¶ 136 (alleging that Stollmeyer "made himself available to Vista" throughout the go-shop period); *id.* ¶ 138 (alleging that Stollmeyer, with White, delayed providing diligence to a potential bidder during the go-shop period).

with a minimum duration or involving a minimum number of potential bidders."[192]

They cite two cases for the proposition that the go-shop was "well within the range routinely approved" by the court.[193]   But neither case involved meaningful challenges to the sale process itself, and so neither decision included an extensive discussion of whether the go-shop cured process defects.[194]

Plaintiffs cite to one case concerning the go-shop that is more on point—*Blueblade Capital Opportunities LLC v. Norcraft Cos.*[195]   There, in a post-trial opinion resolving a petition for appraisal, the court concluded that the merger price was not a reliable indicator of fair value because a conflicted fiduciary tainted the sale process.[196]   In view of those issues, the court held that the target's thirty-five day go-shop fell short of providing a curative "meaningful market check."[197]   The

---

[192] Defs.' Opening Br. at 52 (quoting *Toys "R" Us*, 877 A.2d at 1000).

[193] Defs.' Reply Br. at 23–24 (citing *Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905 (Del. Ch. July 31, 2013); *In re Pennaco Energy, Inc. S'holders Litig.*, 787 A.2d 691 (Del. Ch. 2001)).

[194] *See Miramar*, 2013 WL 4033905, at *8 (rejecting the argument that "the thirty-day go-shop was too short, and . . . destined to fail" where the plaintiff's criticisms of the sale process itself were conclusorily pled and the plaintiff could not "explain how the process was not cured by the subsequent inclusion of strategic sponsors before the Merger Agreement was executed and during the thirty-day go-shop"); *Pennaco*, 787 A.2d at 705–706 (concluding on a preliminary injunction record that the plaintiffs lacked a probability of success on their *Revlon* claim where the sale process could not "be characterized as unreasonable").

[195] 2018 WL 3602940 (Del. Ch. July 27, 2018).

[196] *Id.* at *24–25.

[197] *Id.* at *25–26.

go-shop at issue in *Blueblade* required that, "[i]n order to proceed with an alternate transaction, [the target] had to receive a 'Superior Proposal' by the end of the Go-Shop Period, essentially requir[ing] the bidder to get the whole shebang done within" thirty-five days.[198]

Here, as in *Blueblade*, the go-shop required that a competing bidder make a Superior Proposal within the go-shop period.[199] It also required Mindbody to accept the Superior Proposal within the go-shop period. And the timing of the go-shop was more problematic than that in *Blueblade*—it ran for only 30 days, and it spanned Christmas and New Year's Eve. Two potential buyers "specifically communicated that they could not compete for Mindbody because of the go-shop's highly compressed timeline."[200] Because the less preclusive go-shop at issue in *Blueblade* was found insufficient to cure analogous process defects, it is reasonable to conclude that the go-shop at issue in this case likewise failed in this regard.

### 3. Material Information Withheld from the Board

Even if Stollmeyer was conflicted and tilted the sale process toward Vista, Defendants argue that dismissal is appropriate because Plaintiffs failed to allege that a majority of the Board that approved the Merger was interested or lacked

---

[198] *Id.* at *26 (internal quotation marks omitted).

[199] Am. Compl. ¶ 134.

[200] *Id.*

independence.  It is true that, as a general rule, a plaintiff "can only sustain a claim for . . . breach of the duty of loyalty by pleading facts showing that it is reasonably conceivable that each of a majority of the board is conflicted."[201]  Plaintiffs argue that the court should invoke an exception to this general rule, which applies when it is adequately alleged that (i) a conflicted fiduciary failed to disclose material information to the board, a theory sometimes referred to as "fraud on the board," a phrase coined in *MacMillan*,[202] or (ii) the board failed to adequately oversee the conflicted fiduciary.[203]  Because Plaintiffs adequately alleged facts to support the first theory, this decision does not address the second.

In *Haley*, the Delaware Supreme Court articulated the materiality standard applicable in this context.  The court explained that an omission is "material" to a

---

[201] *Nguyen v. Barrett*, 2016 WL 5404095, at *5 (Del. Ch. Sept. 28, 2016) (emphasis removed); *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) ("Plaintiffs must plead sufficient facts to show that a majority of the Board of Directors breached the fiduciary duty of loyalty . . . ." (emphasis removed)).

[202] *MacMillan*, 559 A.2d at 1283; *see also Kahn*, 2018 WL 1341719, at *1 n.4 (citing *MacMillan*, 559 A.2d at 1283); *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 238 (Del. Ch. 2014) ("In colloquial terms, a fraud on the board has long been a fiduciary violation under our law and typically involves the failure of insiders to come clean to the independent directors about their own wrongdoing, the wrongdoing of other insiders, or information that the insiders fear will be used by the independent directors to take actions contrary to the insiders' wishes." (quoting *In re Am. Int'l Gp., Inc. Consol. Deriv. Litig.*, 965 A.2d 763, 806–07 (Del. Ch. 2009))).

[203] *Kahn*, 2018 WL 1341719, at *1 n.4 (citing *MacMillan*, 559 A.2d at 1280; *Toys "R" Us*, 877 A.2d at 1002); *MacMillan*, 559 A.2d at 1280, 1283–84; *Xura*, 2018 WL 6498677, at *13 n.131 (citing *Kahn*, 2018 WL 1341719, at *1 n.4, for the proposition that a plaintiff can state a *Revlon* claim "where impartial board members did not oversee conflicted members sufficiently").

board if the undisclosed fact is "relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[204] The key undisclosed fact driving the plaintiffs' theory in *Haley* was that the target's CEO and

[204] *Haley*, 2020 WL 3529586, at \*12. It is appropriate to apply the materiality standard set forth in *Haley* to Plaintiffs' theory, (i) although this case implicates *Revlon* and *Haley* did not, and (ii) although the parties initially briefed this issue using the "critical information" language of *Kahn*, 2018 WL 1341719, at \*1 n.4. As background to the first point, it bears noting that there are essentially two lines of cases addressing the fraud-on-the-board theory advanced by Plaintiffs. In the first line of cases, the challenged transactions gave rise to enhanced scrutiny under *Revlon*. That line of cases traces back to *MacMillan*, 559 A.2d at 1283, and was recently discussed with approval by the Delaware Supreme Court in *Kahn*, 2018 WL 1341719, at \*1 n.4. In the second line of cases, the challenged transactions were presumptively subject to the business judgment standard. That line of cases traces back to *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995), which established a three-part materiality test specific to that context. *See Haley*, 2020 WL 3529586, at \*11 (setting forth the three-part *Technicolor* test). Although the presumptive standards of review differed in *MacMillan* and *Technicolor*, the core concern was the same—the plaintiffs in both cases argued that a conflicted minority tainted the board process as a whole in the context of a negotiated transaction. In establishing the three-part test, *Technicolor* built on the principles set forth in *MacMillan*, and, when applying the three-part *Technicolor* test, *Haley* also drew support from *MacMillan*. *Haley*, 2020 WL 3529586, at \*12. Thus, although *Haley* falls in the second line of cases, and this action falls in the first, the materiality standard applied in these contexts addresses the same concern and derives from the same decisional authority. *See also* Pls.' Suppl. Br. at 6 (agreeing that the materiality standard of *Haley* governs this analysis); Defs.' Suppl. Br. at 2–5 (same). As background to the second point, then Chief Justice Strine wrote in *Kahn* that "there are iconic cases, such as *MacMillan*, that are premised on independent board members not receiving *critical information* from conflicted fiduciaries." 2018 WL 1341719, at \*1 n.4 (emphasis added). Picking up on this language, the parties initially briefed the fraud-on-the-board theory using the "critical information" nomenclature of *Kahn*. Pls.' Answering Br. at 27; Defs.' Reply Br. at 28. There is no substantive difference between the materiality standard applied in this decision and the "critical information" standard of *Kahn* (one of which comes from *MacMillan* and the other of which refers to *MacMillan*), as the parties agree. Pls.' Suppl. Br. at 6 ("We believe the phrase 'critical information' in *Kahn* has the same meaning as material information and that the 'materiality' standard in *Haley* is the best statement of governing law."); Defs.' Suppl. Br. at 2 (stating that "Defendants do not believe there is any meaningful difference between" the "materiality" standard of *Haley* and the "critical information" standard of *Kahn*).

lead negotiator had been presented with a post-merger "compensation proposal having a potential upside of nearly five times his compensation at [the target]."[205] The court concluded that it was reasonably conceivable that the compensation proposal subjectively affected the fiduciary in the course of negotiations and was thus material to the target's CEO.[206] The court then concluded that "the Board would have found it material" that the target's CEO had been presented with the compensation proposal "during an atmosphere of deal uncertainty and before [the board] authorized him to renegotiate the merger consideration."[207]

As *Haley* illustrates, fraud-on-the-board theories frequently involve two materiality inquiries—the first is whether the key fiduciary's alleged conflicts were material to him, and the second is whether the board would have viewed information concerning those alleged conflicts as material.[208] Generally speaking, a strong showing on the first materiality inquiry will drive the outcome. That is, if a key fiduciary was affected by a material conflict, it is likely that the board members will view that conflict as "relevant and of a magnitude to be important . . . in carrying out

---

[205] *Haley*, 2020 WL 3529586, at *12.

[206] *Id.* at *15 ("[T]he materiality inquiry is a subjective test, and '*not* how or whether a reasonable person in the same or similar circumstances would be affected by a financial interest of the same sort as present in the case, but whether *this* director in fact was or would likely be affected'" (quoting *Technicolor*, 663 A.2d at 1167)).

[207] *Id.* at *12.

[208] *Id.* at *11.

their fiduciary duty of care in decisionmaking," as the court held in *Haley*.[209]

This dual materiality inquiry operates the same way in this case. As discussed above, it is reasonably conceivable that Stollmeyer suffered from material conflicts in the sale process that he failed to disclose to the Board. Given the materiality of those conflicts, it is reasonably conceivable that the Board would have viewed them as relevant and of a magnitude to be important in carrying out their decisionmaking process. The allegations concerning Stollmeyer's undisclosed conflicts are catalogued throughout this decision. To adumbrate:

- Stollmeyer effectively kick-started the sale process by reaching out to Qatalyst in August 2018 to "share[] his frustrations with running a public company and his preference for selling Mindbody to a private equity fund that would agree to employ Stollmeyer and his management team in the post-merger entity."[210]

- After Stollmeyer told Qatalyst that he wanted to find a private equity buyer that would retain his management team, Qatalyst reconnected him with Vista.[211]

- Stollmeyer then attended the CXO Summit, where he received "mind blowing," "inspiring," and "impressive" presentations concerning Vista's ability to generate enormous wealth for its CXOs.[212]

- After the "mind blowing," "inspiring," and "impressive" events of the CXO Summit,[213] Stollmeyer received an expression of interest from

---

[209] *Id.* at *12.

[210] Am. Compl. ¶ 45.

[211] *Id.* ¶ 46.

[212] *Id.* ¶¶ 9, 59.

[213] *Id.*

60

Vista.[214]

- During this time period, Vista and Qatalyst facilitated reference calls between Stollmeyer and least two Vista CXOs who were retained by Vista post-acquisition, effectively approximating an employee recruitment process.[215] Stollmeyer later admitted privately that his conversations with these CXOs influenced his decision to sell to Vista.[216]

- Stollmeyer did not immediately disclose Vista's expression of interest to the Board,[217] instructed members of management not to disclose Vista's expression of interest to the Board,[218] and did not inform the Board of his interactions with Vista leading up to and surrounding Vista's expression of interest.[219]

- Stollmeyer did not inform the Board of his dealings and multiple meetings with Qatalyst before the Transaction Committee retained Qatalyst.[220]

---

[214] *Id.* ¶ 65.

[215] *Id.* ¶ 60.

[216] *Id.*

[217] *Id.* ¶ 69.

[218] *Id.* (Stollmeyer stated: "I plan to socialize this possibility to the Board Directors individually over the next week. Please do not hint or otherwise discuss with them or anyone else until I have a chance to do so and give you the green light." (emphasis removed)).

[219] *See, e.g.*, *id.* ¶ 49 ("On August 23, 2018, Saroya and Vista Vice President, Nicholas Stahl, met with Stollmeyer onsite at Mindbody to discuss Mindbody's business and 'Rick's goals.'"); *id.* ¶ 56 ("At the . . . CXO Summit, Stollmeyer continued his discussions with Saroya and Vista co-founders Robert Smith and Brian Sheth."); *id.* ¶ 59 (alleging that Stollmeyer texted Saroya after attending the CXO Summit); *id.* ¶ 64 ("On October 11, 2018, Chang asked Stollmeyer for more information . . . . Three days later, Stollmeyer continued the discussion about a potential transaction with Saroya.").

[220] *Id.* ¶ 45 (August 7, 2018 meeting with Chang); *id.* ¶ 60 (alleging that Qatalyst helped set up reference calls and meetings for Stollmeyer with Vista CXOs in early October 2018); *id.* ¶ 64 (October 11, 2018 communication with Chang); *id.* ¶ 102 (explaining that, before the Transaction Committee interviewed Qatalyst, "Stollmeyer had already met with Qatalyst . . . and was already receiving advice from Qatalyst concerning a deal").

- Stollmeyer eliminated bidders for whom he did not wish to work from the sales and go-shop process while simultaneously providing Vista with timing and informational advantages.[221]

Viewed collectively, these allegations are degrees more troubling than the compensation proposal that the court in *Haley* found sufficient to meet the materiality inquiries. While it was alleged in *Haley* that the CEO received the compensation proposal that gave rise to a pleading-stage inference of conflict, the allegations in this case support an inference that Stollmeyer affirmatively courted Vista. These allegations support the fraud-on-the-board theory advanced by Plaintiffs in this case.

Defendants observe, and it is true, that the Transaction Committee's formation evidences some level of Board involvement and oversight that cuts against the notion that the Board was the passive victim of a rogue fiduciary. Yet, the mere existence of the Transaction Committee does not give rise to the countervailing inference Defendants seek, particularly in view of the following allegations:

- The date of the Transaction Committee's formation is unclear based on the absence of Board minutes memorializing it.[222]

- The Transaction Committee was not initially created for the purpose of "advis[ing], direct[ing], and oversee[ing] management of [Mindbody]

---

[221] *Id.* ¶ 105 (alleging that Stollmeyer removed Global Payments from outreach because he "[didn't] want to work for a Payments company"); *id.* ¶¶ 112, 119 (alleging that Stollmeyer refused to share requested diligence with a Japanese company and that Stollmeyer later admitted that he "did not want to work for a Japanese company").

[222] *Id.* ¶ 71 ("The Proxy states that the Board established the Transaction Committee on October 30. There are no Board minutes from October 30.").

in the review and negotiation of strategic alternatives."[223]  It was not until November 26, 2018 that the Transaction Committee's mandate was officially expanded to encompass that purpose.

- By the time the Transaction Committee's mandate was expanded, the Company had already retained Qatalyst at Stollmeyer's urging,[224] and Stollmeyer and Qatalyst had already "selected potential bidders for Qatalyst to contact."[225]

- The Transaction Committee never retained its own counsel or financial advisor, instead relying entirely on Qatalyst.[226]

- After the Transaction Committee's mandate was expanded, Stollmeyer continued having private conversations with Vista,[227] and the Transaction Committee took a back seat while Stollmeyer vetoed outreach to certain potential bidders and controlled the level of diligence provided to potential bidders.[228]

For these reasons, it is reasonably conceivable that the Board lacked material information and failed to adequately oversee Stollmeyer.  Therefore, at the pleading stage, the presence of a disinterested and independent majority of the Board does not defeat a claim for liability.[229]

---

[223] *Id.* ¶ 108.

[224] *Id.* ¶ 102.

[225] *Id.* ¶ 104.

[226] *Id.* ¶ 109.

[227] *See, e.g.*, *id.* ¶ 107 (alleging that Stollmeyer "continued his private conversations with Vista, including on November 21, 2018").

[228] *Id.* ¶ 109.

[229] As discussed above, the presumptive standard of review in *MacMillan* was *Revlon* and the presumptive standard of review in *Technicolor* was the business judgment rule.  *See* note 204 *supra*.  Yet, in both cases, the court elevated the standard of review to entire fairness in view of the fraud-on-the-board theories advanced by the plaintiffs.  *See* *MacMillan*, 559 A.2d at 1264–65; *Technicolor*, 663 A.2d at 1162–63.  This begs the

## B. The Stockholder Vote Was Not Fully Informed.

Defendants argue that dismissal is appropriate under *Corwin* regardless of Plaintiffs' well-pleaded claim for breach of fiduciary duty.[230] *Corwin* gives rise to the irrebuttable presumption of the business judgment rule when a transaction "is approved by a fully informed, uncoerced vote of the disinterested stockholders."[231] Plaintiffs do not argue that the stockholder vote was coerced. They contend that *Corwin* does not apply because the vote was uninformed.

Under Delaware law, determining whether a vote was fully informed at the pleading stage requires the court to consider whether the "complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[232]

In *Morrison*, the Delaware Supreme Court articulated the materiality standard applicable in this context as follows:

---

question in the instant action: Could this this "paradigmatic *Revlon*" case ultimately be an entire fairness case? I posed a version of this question to the parties, and both sides responded that *Revlon* is the appropriate standard to apply when evaluating the motion to dismiss. Defs.' Suppl. Br. at 11–12; Pls.' Suppl. Br. at 3–4. It is an open issue, in my view, whether entire fairness might ultimately apply, and I invite more detailed presentations concerning the governing legal framework as the case progresses.

[230] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 308 (Del. 2015) (holding that an "uncoerced, informed stockholder vote is outcome-determinative, even if *Revlon* applied to the merger").

[231] *Id.* at 309.

[232] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Framed differently, an omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. But, to be sure, this materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.[233]

As the Delaware Supreme Court recently observed in *Haley*, it is not uncommon that a court find "the same information to be material to both directors and stockholders,"[234] despite the fact that "the materiality inquiry is different in the two contexts."[235]

Although a defendant asserting a defense under *Corwin* bears the burden of proving at trial that the stockholder vote was fully informed, a plaintiff bears the burden to plead disclosure deficiencies.[236] One sufficiently alleged disclosure deficiency will defeat a motion to dismiss under *Corwin*.[237]

In view of the allegations as to Stollmeyer, it should be no surprise that

---

[233] *Id.* at 282–83 (internal quotation marks and citations omitted).

[234] 2020 WL 3529586, at *13 & n.62 (collecting cases).

[235] *Id.* at *13–14.

[236] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7–8 (Del. Ch. Jan. 5, 2017).

[237] *Xura*, 2018 WL 6498677, at *12; *van der Fluit v. Yates*, 2017 WL 5953514, at *8 n.115 (Del. Ch. Nov. 30, 2017).

Defendants' *Corwin* arguments fail at this stage. Generally, where facts alleged make the paradigmatic *Revlon* claim reasonably conceivable, it will be difficult to show on a motion to dismiss that the stockholder vote was fully informed.[238] This generalization plays out when applied to the specific disclosure deficiencies identified by Plaintiffs. Plaintiffs point to two categories of specific disclosure deficiencies: (1) Stollmeyer's conflicts and dealings with Vista; and (2) the Q4 guidance versus the Q4 actuals. Collectively, they are more than sufficient to defeat a *Corwin* defense at the pleading stage.

### 1. Stollmeyer's Conflicts and Dealings with Vista

The first category of disclosure deficiencies involves the same facts that support Plaintiffs' fiduciary duty claims against Stollmeyer—his conflicts of interest and his efforts to tilt the sale process in Vista's favor.

### a. Stollmeyer's Interactions with Vista Concerning Post-Closing Employment

Plaintiffs argue that the disclosures concerning Stollmeyer's interactions with Vista are materially misleading and only true in the literal sense.[239]

The Definitive Proxy disclosed that "[a]t the time of the signing of the Merger

---

[238] *See, e.g.*, *Xura*, 2018 WL 6498677, at \*12–13; *Lear*, 926 A.2d at 114–15.

[239] Pls.' Answering Br. at 57–59 (quoting *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 74 (Del. Ch. 2007)); *see also Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) ("Technically speaking, the language [in the Proxy] may be accurate; but that kind of generality is hardly a substitute for hard facts when the law requires complete candor.").

Agreement, Vista and [Mindbody] had not engaged in any employment or retention-related discussions with regard to [Mindbody] management."[240] The Supplemental Proxy corrected this disclosure to state that: "Vista and [Mindbody] had not discussed *the terms of* post-closing employment or equity participation for Mindbody management."[241]

Facts that shed light on the depth of a lead negotiator's commitment to the acquirer and personal economic incentives are generally deemed material to a reasonable stockholder. Two cases are instructive.

In *Morrison*, a *Corwin* dismissal was reversed because the company failed to disclose facts that "would have shed light on the depth of the [chairman's] commitment to [the acquirer], the extent of [the chairman's] and [the acquirer's] pressure on the Board, and the degree that this influence may have impacted the structure of [the] sale process."[242] The company did not disclose, for example, that the chairman had agreed early on in the sale process to "roll over his equity interest" if the acquirer reached a deal with the target's board.[243] Nor did the company disclose the chairman's "clear preference" for the ultimate acquirer and "reluctance

---

[240] Definitive Proxy at 32.

[241] Supplemental Proxy at 5 (emphasis added).

[242] 191 A.3d at 275.

[243] *Id.* at 277.

to consider bids from other prospective purchasers."[244] The Delaware Supreme Court observed that the former was material because "a reasonable stockholder would want to know about [that] level of commitment to a potential purchaser."[245] The court further observed that the latter was also material because, "if disclosed, a reasonable stockholder might infer that [the chairman's] expression of a clear preference for [the acquirer] and reluctance to engage with other bidders hindered the openness of the sale process."[246]

In *Xura*, this court held that *Corwin* cleansing did not apply because the company failed to disclose, among other things, that the acquirer "made clear its intention to work with management (including [the CEO]) after consummation of the [t]ransaction" and that the CEO had received word that "his position at [the target] was in jeopardy if the [c]ompany was not sold."[247] This court observed: "Plaintiff alleges that stockholders were entirely ignorant of the extent to which [the CEO] influenced the negotiations and ultimate terms of the [t]ransaction, not to mention his possible self-interested motivation for pushing an allegedly undervalued [t]ransaction on the [c]ompany and its stockholders."[248]

---

[244] *Id.* at 280.

[245] *Id.* at 284.

[246] *Id.* at 286.

[247] *Xura*, 2018 WL 6498677, at *12.

[248] *Id.* at *13; *see also Lear*, 926 A.2d at 114 ("Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by

At this stage, it is reasonably conceivable that Stollmeyer's discussions with Vista concerning the prospect of his future employment would rise to the level of material in the eyes of a stockholder.[249] Like the company in *Morrison*, Mindbody did not disclose facts that would have "shed light on the depth of [Stollmeyer's] commitment to [Vista]"[250] or "reluctance to consider bids from other prospective purchasers."[251] And like the company in *Xura*, Mindbody did not disclose facts speaking to "the extent to which [Stollmeyer] influenced the negotiations and

a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").

[249] *See In re Fam. Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at \*20 (Del. Ch. Dec. 19, 2014) ("[S]tockholders should receive full and fair disclosures about whether a negotiator for the target had, by virtue of an expectation of post-closing employment with the acquirer, incentives that might conflict with those of the target's stockholders."); *see, e.g.*, *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1179 (Del. Ch. 2010) (concluding that the proxy statement "create[d] the materially misleading impression that management was given no expectations regarding the treatment they could receive from [the acquirer]" despite the reality that the acquirer and the CEO had discussions concerning the nature of a typical executive equity incentive package and that the CEO was led to believe that "top management would likely be retained"); *Topps*, 926 A.2d at 74 (finding that the proxy was materially misleading because it failed to disclose that the acquirer's proposal "was designed to retain substantially all of [the target's] existing senior management and key employees" and that the acquirer "had continually communicated that intention and his high regard for [the target's] management" (internal quotation marks omitted)); *cf. Morrison*, 191 A.3d at 275 (finding that the fact and timing of a CEO's agreement with a bidder that contemplated an equity roll-over was material because it "would have shed light on the depth of [the CEO's] commitment to [the bidder], the extent of [the CEO's] . . . pressure on the Board, and the degree that this influence may have impacted the structure of the sale process").

[250] *Morrison*, 191 A.3d at 275.

[251] *Id.* at 280.

69

ultimate terms" of the Merger and Stollmeyer's "self-interested motivation for pushing an allegedly undervalued [t]ransaction."[252]

Mindbody did not disclose, for example, that Stollmeyer pursued discussions with Vista only after expressing "his frustrations with running a public company and his preference for selling Mindbody to a private equity fund that would agree to employ Stollmeyer and his management team in the post-merger entity."[253] Nor did Mindbody disclose that Stollmeyer met with Vista in late August 2018 to discuss his own "goals" and thereafter attended two days' worth of presentations highlighting the wealth of Vista CXOs."[254] Perhaps most critically, stockholders were not made aware that Stollmeyer had interacted privately on numerous occasions with Vista and Vista CXOs before and during the sale process[255] or that Vista's offer letter

---

[252] *Xura*, 2018 WL 6498677, at *13.

[253] Am. Compl. ¶ 45.

[254] *Id.* ¶ 49.

[255] *See, e.g.*, *id.* ¶ 49 ("On August 23, 2018, Saroya and Vista Vice President, Nicholas Stahl, met with Stollmeyer onsite at Mindbody to discuss Mindbody's business and 'Rick's goals.'"); *id.* ¶ 56 ("At the . . . CXO Summit, Stollmeyer continued his discussions with Saroya and Vista co-founders Robert Smith and Brian Sheth."); *id.* ¶ 59 (alleging that Stollmeyer texted Saroya after attending the CXO Summit); *id.* ¶ 64 ("On October 11, 2018, Chang asked Stollmeyer for more information . . . . Three days later, Stollmeyer continued the discussion about a potential transaction with Saroya."); *id.* ¶ 65 (explaining that Saroya provided Stollmeyer with a "direct expression of interest" to acquire Mindbody at "a substantial premium to recent trading range" on October 16, 2018); *id.* ¶ 101 ("On November 10, Stollmeyer texted Saroya, and asked to speak by phone. Shortly thereafter, Stollmeyer and Saroya agreed to meet at Vista's San Francisco offices."); *id.* ¶ 107 ("Stollmeyer continued his private conversations with Vista, including on November 21, 2018."); *id.* ¶ 113 ("Stollmeyer and Saroya continued text messaging and speaking by phone throughout November and mid-December concerning Vista's review of

contained strong signals about post-closing employment for management.[256] While these events transpired, Stollmeyer nixed other potential bidders throughout the sale process[257]–yet another fact Mindbody did not disclose to its stockholders.

In light of *Morrison* and *Xura*, it is at least reasonably conceivable that a reasonable stockholder would consider Stollmeyer's discussions with Vista concerning the prospect of his future employment material.

### b. Vista's Expression of Interest

Plaintiffs allege that the substance of Vista's October 16, 2018 expression of interest was material and should have been disclosed.

The Definitive Proxy disclosed that "the $36.50 per share price was the highest price Vista would be willing to offer."[258] The Supplemental Proxy disclosed that, on October 16, 2018, "Vista indicated to Mr. Stollmeyer that it was interested

---

the 1,000 documents in the data room to which Vista received access."); *id.* ¶ 114 ("Saroya and Stollmeyer spoke on the evening of December 17 to talk 'about go to market and some of [Vista's] findings' and they spoke again on December 18 . . . ." (alteration in original)).

[256] *Id.* ¶ 118 ("Vista said it was 'thoroughly impressed with Mindbody's executive management team,' and 'look[ed] forward to forming a successful and productive partnership with them going forward.'" (alteration in original)); *id.* (alleging that Vista's offer letter "made clear that Vista 'seeks to invest in and partner with superior management teams,' and that 'through equity participation programs and incentive structures, Vista seeks to align management's incentives with its own in any potential transaction'" (emphasis removed)).

[257] Am. Compl. ¶ 105 (alleging that Stollmeyer removed Global Payments from outreach because he "[didn't] want to work for a Payments company"); *id.* ¶¶ 112, 119 (alleging that Stollmeyer refused to share requested diligence with a company for which he did not want to work).

[258] Definitive Proxy at 31.

71

in pursuing strategic transaction discussions with [Mindbody]."[259] The Proxy did not disclose that Vista's indication was to acquire Mindbody at "a substantial premium to recent trading range."[260]

At the time Vista's expression of interest was made, Mindbody's thirty-day volume weighted average price was $38.40, and Mindbody stock traded as high as $41.25 per share in October. Thus, it is reasonably conceivable that Vista's statement on October 16, 2018 that it was willing to pay "a substantial premium to recent trading range"[261] signaled Vista's willingness to pay a price per share much higher than the ultimate Merger price. If proven, that fact would be material to a reasonable stockholder.

Defendants argue that Mindbody was not required to disclose Vista's expression of interest because "preliminary discussions that do not reach the level of serious negotiations are not material—and their existence need not be disclosed at all."[262] As a generalization, this statement is accurate. Applied to the specifics of this case, it does not help Defendants. None of the cases upon which Defendants rely involved a situation like that alleged here, where the ultimate acquirer, after

---

[259] Supplemental Proxy at 4.

[260] Am. Compl. ¶ 65 (emphasis removed).

[261] *Id.* (emphasis removed).

[262] Defs.' Opening Br. at 76–77 (citing *In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9, 29 (Del. Ch. 2004); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989)).

weeks of discussions and interactions with the target's CEO and Chairman, made a "direct expression of interest" to acquire the target at "a substantial premium to recent trading range" at a time when the target's stock was trading at a price higher than the ultimate per-share merger price.[263] These allegations make it reasonably conceivable that the omitted information would have been viewed as material by a reasonable stockholder.

### c.     Vista's Timing and Informational Advantages

Plaintiffs argue that the Proxy materially misled stockholders when it failed to disclose facts concerning the advantages provided to Vista throughout the sale process and go-shop phases.

As to the sale process, the Proxy did not disclose that Stollmeyer removed a payments company from outreach because he did not want to work for a payments company.[264] It did not disclose that Stollmeyer provided Saroya with real-time input

---

[263] *See MONY*, 852 A.2d at 29–30 (holding that there was no obligation to disclose an expression of interest made by an entity *other than the ultimate acquirer* that "did not provide price or structure" and was contingent on the pending deal's failure); *Shamrock*, 559 A.2d at 261–62, 274–75 (involving the adoption of an employee stock ownership plan, not a merger, and holding that there was no obligation to disclose that an entity had "expressed its interest in a 'friendly' meeting" with management because "[i]ts only significance [was] as a possible forerunner to an acquisition proposal" that *ultimately did not materialize*); *see also Alessi v. Beracha*, 849 A.2d 939, 945–46 (Del. Ch. 2004) (distinguishing *MONY* and *Shamrock* on similar bases and holding that the challenged information was material because "[the company] was for sale, the discussions were substantive and advanced, an offer was made, and the sale was actually consummated").

[264] Am. Compl. ¶ 105 (emphasis removed).

on Vista's valuation model, let alone that he did not provide the same to other potential bidders. It did not disclose that Vista received access to more than a thousand documents in the data room throughout the diligence phase while other potential acquirers received access to as little as thirty-five. It did not mention that Stollmeyer, after Vista made its initial bid of $35 per share, declined to share additional diligence with a company that Stollmeyer eventually admitted that he did not want to work for.[265]

As to the go-shop phase, the Proxy disclosed that the 30-day go-shop period was "customary"[266] and that certain parties were "granted access to the same electronic data room populated by [Mindbody] with the same documents to which Vista was provided access."[267] It does not disclose that Mindbody, when populating the go-shop data room, made "some subtractions" to the diligence Vista received before making its initial bid[268] and did not include all of the information Vista received before making its final bid.

Taken together, these facts make it reasonably conceivable that the Proxy omitted material facts or otherwise materially misled stockholders concerning Vista's advantages throughout the sale process and go-shop phase. When corporate

---

[265] *Id.* ¶ 163.

[266] Definitive Proxy at 34.

[267] *Id.* at 32.

[268] Am. Compl. ¶ 137.

leadership "treat[s] a serious bidder in a materially different way and that approach might have deprived shareholders of the best offer reasonably attainable,"[269] a reasonable investor might view information concerning such disparate treatment as altering the total mix of information made available.[270] A reasonable stockholder would find this information important "because it would have helped the stockholder to reach a materially more accurate assessment of the probative value of the sale process."[271]

Defendants assert that all relevant material facts were disclosed to Mindbody's stockholders because the Definitive Proxy attached the Merger Agreement and because the Supplemental Proxy attached Plaintiffs' briefing in the Section 220 Action.[272] Attaching the Merger Agreement to the Definitive Proxy makes no difference, as the text of the Merger Agreement does not disclose the facts

---

[269] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *9 (Del. Ch. Jan. 3, 2013).

[270] *See In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 451 (Del. Ch. 2012) (observing that the actions of "conflicted CEOs in baking up deals with their favorite private equity sponsors before any market check (or often even board knowledge) likely dampen[s] the competition among private equity firms that could have generated the highest price if proper conduct occurred and the right process had been used"); *see also In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del. Ch. Aug. 8, 1988) (observing that corporate leadership "may never appropriately favor one buyer over another for a selfish or inappropriate reason").

[271] *Morrison*, 191 A.3d at 284.

[272] Defs.' Opening Br. at 84–85. Plaintiffs' briefing in the Section 220 Action explained in a footnote that Stollmeyer was on vacation during the go-shop period. Supplemental Proxy at 44 n.3.

addressed above. And attaching Plaintiffs' briefing in the Section 220 Action to the Supplemental Proxy while simultaneously proclaiming that the claims were "without merit"[273] did little to fully and fairly inform Mindbody stockholders of material information.[274]

---

[273] Supplemental Proxy at 4.

[274] *See In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 n.47 (Del. Ch. June 5, 2001) ("I give no weight to the defendants' decision to attach the plaintiffs' entire complaint to the proxy. . . . The proxy . . . does not embrace [the contested point] or any other feature of the complaint, which is described as being 'without merit.'"). Defendants argue that the court's observation in *Staples* was mere dictum and that the court later declined to endorse that view in another case. Defs.' Reply Br. at 36–37 (citing *Brinckerhoff v. Tex. E. Prods Pipeline Co.*, 2008 WL 4991281, at *5 (Del. Ch. Nov. 25, 2008)). In *Brinckerhoff*, the court found that sufficient disclosures were made where the company (1) attached the plaintiffs' original complaint to a proxy statement filed more than two months before the final vote on the challenged proposals; (2) posted the complaint on its website; and (3) issued supplemental proxy materials that summarized the complaint and referred unitholders to the two locations where the entire complaint could be found. *Id.* at *5. Defendants represent in briefing that the Supplemental Proxy "disclosed [Plaintiffs'] complaint in the [Section 220 Action] and documents filed in connection therewith." Defs.' Opening Br. at 24. The text of Plaintiffs' complaint in the Section 220 Action, though, is nowhere to be found in the Supplemental Proxy. Rather, the Supplemental Proxy attaches only the briefing submitted in connection with Plaintiffs' motion to expedite proceedings. *See* Supplemental Proxy at 9–49; *cf. Michelson v. Duncan*, 386 A.2d 1144, 1154 (Del. Ch. 1978) (observing that stockholders were informed of the essential facts because "[t]hey were provided with the complete text of plaintiff's complaint, and, all alleged wrongs for which ratification was sought were enumerated in detail"), *aff'd*, 407 A.2d 211 (Del. 1979); *Michelson v. Duncan*, 407 A.2d 211, 221 (Del. 1979) (affirming the Court of Chancery's holding only because "it would have been wholly . . . unreasonable for management to be required to have made" the challenged non-disclosures, since they "(a) were not factual assertions; (b) in some respects were not factually correct; (c) were inconsistent with management's position; and (d) called for legal conclusions"). Further, unlike the proxy in *Brinckerhoff*, the Supplemental Proxy does not refer stockholders to any location in which the text of Plaintiffs' Section 220 complaint can be found. And perhaps most importantly, the proxy in *Brinckerhoff* did not describe the complaint as meritless, as the Proxy did here. *Brinckerhoff* is therefore distinguishable in multiple respects.

### 2. Q4 Guidance and Q4 Actuals

The second category of disclosure deficiencies identified by Plaintiffs is the description of the Merger consideration as a premium. The Proxy disclosed that the per share merger Consideration constituted a premium of approximately 68% to the then-current trading price of Mindbody stock.[275] It is true that the Merger price was 68% higher than the stock price immediately prior to the Merger's announcement. Plaintiffs argue that gauging value against the then-current trading price is materially misleading because Defendants drove down that price by lowering Q4 guidance and then failed to disclose Q4 actuals reflecting that the Company substantially beat both the original and lowered guidance.[276]

Defendants focus their arguments on disclosure of the Q4 actuals, arguing that such information was immaterial because the SEC rules do not require disclosing unaudited, intra-quarter revenue,[277] the summary of Qatalyst's fairness opinion and underlying discounted cash flow analysis was sufficiently disclosed to stockholders,[278] and the Q4 actuals were irrelevant to Qatalyst's opinion.[279] Defendants further contend that disclosure of the unaudited financials without the

---

[275] Definitive Proxy at 3, 33.

[276] Pls.' Answering Br. at 65–71.

[277] Defs.' Opening Br. at 68–69.

[278] *Id.* at 70–71.

[279] *Id.* at 71.

full set of earnings information required by the SEC "would have risked presenting stockholders with partial information that would have been potentially misleading."[280]

Defendants' arguments do not work, mostly because they ignore Plaintiffs' well-pleaded allegations that Stollmeyer drove down the stock price by lowering Q4 guidance, rendering it reasonably conceivable that the Q4 actuals would correct the misleading impression created by the deflated stock price and the 68% premium based thereon. Defendants' arguments are misplaced in other ways, as this court has found information material that the SEC does not require to be disclosed,[281] and as Qatalyst's fairness opinion did not occupy the field of information material to the stockholder vote or render other information immaterial. The cases Defendants cite are not to the contrary.[282]

---

[280] *Id.* at 72–74.

[281] *Compare Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980) (holding that the SEC "does not require a company to disclose financial projections"), *with Maric*, 11 A.3d at 1178 (holding that "management's best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information").

[282] *Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103 (Del. Ch. Oct. 23, 2013), on which Defendants rely, does not excuse a failure to disclose the Q4 actuals. There, the plaintiff sued the company after losing a contested direct election to replace the board. The plaintiff sought to put aside the results of the election based in part on the allegation that the company decided to conceal its quarterly results until after the election. This court recognized that "a company intentionally delay[ing] releasing financial results until after a stockholder vote" could "warrant serious judicial scrutiny," but rejected the plaintiffs' contention in a post-trial decision only because the plaintiffs failed to prove it. *Id.* at *16 & n.187. *Red Oak* does not counsel in favor of rejecting Plaintiffs' disclosure claims at the pleading stage. The other cases Defendants rely on are similarly inapposite. *See Frank v.*

78

In the end, it is reasonably conceivable that Plaintiffs will prove at trial that, as White put it, the "right thin[g] to do [was] to publicly release [the Q4 actuals to stockholders] before they vote."[283]

## C. The Complaint States a Claim Against White, but Not Against Liaw.

Plaintiffs allege that White and Liaw breached their fiduciary duties in connection with the Merger. Plaintiffs primarily pursue claims for breach of the

---

*Arnelle*, 1998 WL 668649, at *8–9 (Del. Ch. Sept. 16, 1998) (rejecting argument that defendants were required to extend close of auction to issue supplemental disclosure where federal law did not require extension and where the court was "not convinced that this information was material or significant to a reasonable stockholder"), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE); *Lewis v. Vogelstein*, 699 A.2d 327, 332 (Del. Ch. 1997) (rejecting argument that a stockholder-approved compensation plan must state the value of options because the Financial Accounting Standards Board requires financial statements to state "a value of options granted to directors according to a stock-option pricing model" on grounds that mandated "corporate disclosure concerning prospective options grants involves . . . technical judgments concerning what is feasible and helpful in varying circumstances" that should be made by "an agency with finance expertise").

[283] Am. Compl. ¶ 142. The Amended Complaint also pleads a non-exculpated disclosure claim against Stollmeyer. "[W]here a complaint alleges or pleads facts sufficient to support the inference that the disclosure violation was made in bad faith, knowingly or intentionally, the alleged violation implicates the duty of loyalty" and exculpatory provisions cannot provide a basis for dismissal. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. 1999). Here, it is at least reasonably conceivable that Stollmeyer made the disclosure violations described in this Section knowingly. Stollmeyer signed the Definitive Proxy. *See* Definitive Proxy at 4. And most of the alleged disclosure deficiencies involve actions taken by Stollmeyer. *See Chen*, 87 A.3d at 692 (observing that disclosure deficiencies "include[d] actions taken by particular directors" and holding that one such director "should have recognized and corrected [the disclosure deficiency] before signing off on the Proxy Statement"); *Orman*, 794 A.2d at 41 (finding that, because the plaintiff pled facts making it reasonable to infer that the actors "decid[ing] what information to include" in the proxy were conflicted, it was improper to "say, as a matter of law, that the complaint unambiguously state[d] only a duty of care claim").

79

duty of loyalty as to each, but White is an officer and is thus not protected by the exculpatory charter provision. This decision addresses the allegations concerning White before turning to the allegations concerning Liaw.

### 1. White

White was Mindbody's CFO and COO. He did not serve on the Board. "As an officer of [Mindbody], [White] is not exculpated by the Company's 102(b)(7) provision."[284] As a result, Plaintiffs "may plead either a breach of the duty of care or loyalty" to defeat White's motion to dismiss.[285]

A breach of the duty of care exists where the fiduciary acted with gross negligence.[286] "Gross negligence involves more than simple carelessness. To plead gross negligence, a plaintiff must allege 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'"[287]

---

[284] *Morrison*, 2019 WL 7369431, at *22.

[285] *Id.*

[286] *Id.*

[287] *Id.* (quoting *Zucker v. Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 30, 2016)); *see id.* at *25 (sustaining a fiduciary duty claim against a company's general counsel on gross negligence theory). It is an open issue of Delaware law as to whether *Revlon* applies to an officer's actions. *See* Lyman Johnson, *Delaware's Long Silence on Corporate Officers*, Columbia Law School's Blog on Corporations and the Capital Markets (May 23, 2017), https://clsbluesky.law.columbia.edu/2017/05/23/delawares-long-silence-on-corporate-officers/ ("Several other issues pertaining to officer duties also remain unclear under Delaware law, even though these matters have repeatedly been addressed with respect to directors. These include: . . . whether officers *qua* officers might have their conduct reviewed under the *Unocal* or *Revlon* standards."). Ultimately, though, "*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply." *Malpiede*, 780 A.2d at 1083.

It is reasonably conceivable that White acted with gross negligence throughout the sale process. On October 16, 2018, Stollmeyer informed White of Vista's expression of interest. Thereafter, White obeyed Stollmeyer's instructions not to disclose Vista's expression of interest to the Board. On October 17, 2018—one day after White was made aware of Vista's expression of interest—White himself began to search for "a creative way to guide 2019."[288] In response, Mindbody's senior director of investor relations explained to White that the Company stood to "realize the monetization" of its newly implemented payment platform but that Stollmeyer wanted to throw the Booker acquisition "under the bus" and "guide below the Wall Street expectations" regardless.[289] Stollmeyer himself told White that "a few hundred thousand Q4 revenue" would make a "huge difference" on the upcoming earnings call.[290] Nonetheless, on November 6, 2018, White himself delivered the lowered guidance on the Q3 earnings call.

White was also involved in providing timing and informational advantages to Vista throughout the sale process. Plaintiffs allege that White, with Stollmeyer, populated Vista's substantial data room. They also allege that during the go-shop, White "delayed for days" in approving a potential bidder's diligence requests,

---

[288] *Id.* ¶ 79.

[289] *Id.*

[290] *Id.* ¶ 83.

thereby preventing that potential bidder from receiving certain diligence before the go-shop expired.[291] Also during the go-shop, White asked Stollmeyer, who was on vacation at the time: "I assume that we will be declining any go shop management discussion until you return, correct?"[292] And finally, once Mindbody received its actual Q4 results (before the end of the go-shop period), White immediately provided them to Vista. He did not provide them to other potential bidders.[293]

In view of these facts, it is reasonably conceivable that White was at least recklessly indifferent to the steps Stollmeyer took to tilt the sale process in Vista's favor.

Plaintiffs also argue that White was conflicted with respect to the transaction by the prospect of future compensation. Plaintiffs allege that "Qatalyst informed White that Mindbody management could expect to double its equity stake post-Merger"[294] and that "Vista's offer letter advertised Vista's support for the management team."[295] Plaintiffs further allege that "Stollmeyer told White that [Stollmeyer] would only support a sale of Mindbody to 'an acquirer who sees our

---

[291] *Id.* ¶ 138.

[292] *Id.* ¶ 135.

[293] It is true that White proposed that the Q4 actuals be disclosed to stockholders in advance of the stockholder vote on the Merger. But the fact of this ultimately unimplemented proposal is insufficient to undermine the reasonable conceivability that White acted with gross negligence (at a minimum) throughout the sale process.

[294] Pls.' Answering Br. at 44 (citing Am. Compl. ¶ 62).

[295] *Id.* (citing Am. Compl. ¶ 118).

current capabilities.'"[296]  In the end, allegations as to White's conflicts lack the heft of the allegations leveled against Stollmeyer and present a closer call.  Because a breach of the duty of care has been adequately alleged as to White, this court need not resolve whether a breach of the duty of loyalty has been adequately alleged as to White.

### 2.    Liaw

As to Liaw, Plaintiffs advance a version of a liquidity-driven conflict based on IVP's investment in the Company, arguing that Liaw was conflicted because IVP was seeking to exit its investment in Mindbody.[297]

As previously discussed, liquidity-driven conflicts can be difficult to plead.[298] This court routinely rejects such theories when based on a fund's expiring investment horizon.[299]

---

[296] *Id.* (quoting Am. Compl. ¶ 68).

[297] Pls.' Answering Br. at 45.

[298] *See supra* Section II.A.1.

[299] *Gamco*, 2016 WL 6892802, at *17 (rejecting liquidity theory despite allegations that stockholder forced "needless" transactions "at suboptimal prices" in order to meet its own "timetable"); *Crimson*, 2014 WL 5449419, at *19 (dismissing complaint alleging liquidity-driven conflict theory where it was alleged that the defendant investment management firm "usually holds its assets for five years, but has held its interest [the relevant company] for eight," and that the firm's "longer-than-normal investment in [the company] reflected the illiquid size of its control block"); *Chen*, 87 A.3d at 671–72 (rejecting liquidity-driven conflict theory on a summary judgment record where it was alleged that that the institutional investor desired to wind down the fund throughout which it owned the target's stock); *Morton's*, 74 A.3d at 667 (rejecting liquidity-driven conflict theory based on allegation that the private equity fund urgently needed cash to raise a new fund and to free up investors to participate in that fund).

Unlike Stollmeyer, the allegations against Liaw do not fall into the rare fact pattern. Plaintiffs allege that IVP began investing in Mindbody in 2012 and had invested over $20 million in Mindbody prior to the Company's initial public offering in 2015. IVP's investment in Mindbody was held in a fixed-life investment fund that sought to exit its investments between three to five years. The Amended Complaint alleges that "IVP had a 2018 target date to liquidate its Mindbody investment" and that "Liaw was planning to step down from the Board in 2019."[300] And IVP's super-voting Class B stock was subject "to a time-based sunset provision, which would automatically convert the Class B super-voting stock to common stock by 2021."[301] Together, Plaintiffs allege, these facts indicate that "a near-term sale allowed Liaw to use his directorship and IVP's clout to obtain IVP's desired objective."[302]

Even assuming that Liaw was conflicted by virtue of IVP's expiring investment horizon, the Amended Complaint does not support a reasonable inference that Liaw took any action to tilt the process toward his personal interest. Amid an otherwise comprehensive and compelling brief, Plaintiffs fail to make arguments specific to Liaw. He is not alleged to have been involved with the

---

[300] Am. Compl. ¶ 26.

[301] *Id.* ¶ 38.

[302] Pls.' Answering Br. at 45.

lowered guidance issued on November 6, 2018.[303] He is not alleged to have been meaningfully involved in the diligence phase, throughout which Plaintiffs allege that Stollmeyer treated potential bidders differently than Vista.[304] In fact, the Amended Complaint contains no allegation that Liaw interacted or communicated with *any* potential bidder, let alone Vista. The Amended Complaint similarly contains no mention of Liaw playing any sort of role throughout the go-shop period.[305] When White suggested to Liaw that the Q4 actuals be disclosed to stockholders ahead of the stockholder vote, Liaw actually agreed.[306] The dearth of compelling allegations as to Liaw is not surprising, given that one of Plaintiffs' reasonably conceivable

---

[303] *See, e.g.*, Am. Compl. ¶ 77 ("Meanwhile, *Stollmeyer and White* plotted to drive down Mindbody's stock price." (emphasis added)); *id.* ¶ 79 (alleging that *White* asked whether there was a "creative way to guide 2019" and that *Stollmeyer* "wanted to guide below the Wall Street expectations"); *id.* ¶ 83 (alleging that "*Stollmeyer told White* . . . that 'a few hundred thousand of Q4 revenue makes a huge difference Tuesday'" (emphasis added)); *id.* ¶ 87 (alleging that *Stollmeyer* revised the Company's press release for the November 6, 2018 earnings call); *id.* ¶ 89 ("*Stollmeyer and White* led the Q3 analyst call on November 6." (emphasis added)).

[304] *See, e.g.*, *id.* ¶ 110 (alleging that *Stollmeyer and White* used a list of Vista's diligence requests to populate a data room for Vista); *id.* ¶¶ 113–114, 116 (alleging that *Stollmeyer* remained in contact with Vista throughout the diligence phase); *id.* ¶ 119 (alleging that, after Vista made its original bid of $35 per share, "*Stollmeyer* continued to run interference with other bidders" (emphasis added)).

[305] *Id.* ¶ 21 ("*Stollmeyer and White* sabotaged the go-shop by disappearing on vacations, during which time they made themselves available to Vista but refused to schedule any meetings with prospective bidders." (emphasis added)); *id.* ¶ 135 ("*Stollmeyer and White* also went on vacation during the go-shop." (emphasis added)); *id.* ¶ 138 ("*Stollmeyer and White* delayed providing diligence to [a potential bidder], effectively running the clock on the go-shop." (emphasis added)).

[306] *Id.* ¶ 142.

85

theories is that the Board failed to oversee Stollmeyer sufficiently.

Plaintiffs argue that "Liaw formed an alliance with Stollmeyer in which they used their board positions and super-voting Class B stock to bring about a near-term sale within IVP's desired investment horizon,"[307] but their position finds no support in the Amended Complaint. Lacking concrete allegations of involvement in the sale process like those described in the preceding paragraph, the Amended Complaint fails to create a reasonable conceivability that Liaw was "operating in league with Stollmeyer."[308] The motion to dismiss is therefore granted as to Liaw.[309]

---

[307] Pls.' Answering Br. at 47.

[308] *Id.* at 54.

[309] The dismissal of Liaw is a pre-judgment order. "Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to reargue every previous ruling." *Siegman ex rel. Siegman v. Columbia Pictures Entm't, Inc.*, 1993 WL 10969, at *3 (Del. Ch. Jan. 15, 1983) (internal quotation marks omitted). "If discovery shows that [Liaw] had a more significant and compromising role, then subject to the law of the case doctrine, [the plaintiff] can seek to revisit [Liaw's] dismissal, should future developments provide a compelling reason for doing so." *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *43 (Del. Ch. June 11, 2020) (citing *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994)); *see id.* (dismissing a director from the case because "it [was] not reasonably conceivable that [the director] could be held liable based on the events described in the complaint" but holding that the plaintiffs could "seek to revisit her dismissal[] should future developments provide a compelling reason for doing so"); *see also Bamford v. Penfold, L.P.*, 2020 WL 967942, at *31 n.24 (Del. Ch. Feb. 28, 2020) (allowing the plaintiffs to revisit dismissal of a fraud claim "[i]f discovery suggest[ed] a role for th[at] claim").

86

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED as to Stollmeyer and White.  Defendants' motion to dismiss is GRANTED as to Liaw.